**Plaintiffs' Exhibits  Set B**

Not Reported in F.Supp., 1990 WL 96202 (E.D.Pa.)
**(Cite as: 1990 WL 96202 (E.D.Pa.))**

H

Only the Westlaw citation is currently available.

United States District Court, E.D. Pennsylvania.
**ELECTRONIC LABORATORY** SUPPLY COM-
PANY, INC., et al.
v.
**MOTOROLA**, INC., et al.

CIV. A. No. 88–4494.
July 3, 1990.

Robert LaRocca, Kohn, Savett, Klein & Graf, P.C.,
Harold E. Kohn, Philadelphia, Pa., for plaintiffs.

Jami W. McKeon, Morgan Lewis & Bockius, Phila-
delphia, Pa., Motorola, Inc.

Patrick W. Kittredge, Kittredge, Kaufman & Donley,
Philadelphia, Pa., for R. Cullen, R. Hauben & J.
Wolfson.

*MEMORANDUM AND ORDER*
HUTTON, District Judge.
**\*1** Presently before the Court are defendants'
Motion to Strike Plaintiffs' Amended Pretrial Memo-
randum, plaintiffs Electronic Laboratory Supply
Company's ("ELSCO") and Jack Snyderman's re-
sponse, and defendants' reply. For the following rea-
sons, defendants' motion is DENIED.

*I. FACTUAL BACKGROUND*
Defendant Motorola in this action manufactures
and sells electronic equipment and components, in-
cluding various integrated circuits, discrete semicon-
ductors, and microprocessor units. For various rea-
sons, a certain number of Motorola's semiconductor
devices do not meet its quality-assurance standards.
These below-quality semiconductors are considered
"scrap material" by Motorola and destroyed in order
to ensure that only first-quality semiconductors enter
the market, thereby protecting Motorola's name and
reputation.

From 1980 to the present, Motorola contracted
with plaintiff ELSCO to remove and destroy
Motorola's scrap material. Pursuant to this contract,
ELSCO purchased the scrap material and agreed to
transport it from Motorola's facilities, promptly de-

stroy it, and send a Certificate of Destruction within
30 days of receiving the material.

Believing that ELSCO was not in fact destroying
the scrap material but was selling it instead, Motorola
commenced an action against ELSCO, Jack Snyder-
man, New Jersey Semiconductor, and Robert Hilde-
brandt raising various claims, including claims for
trademark violations under the Lanham Act, 15
U.S.C. §§ 1051–1128. At the same time, Motorola
obtained an *ex parte* seizure order from the Court
pursuant to 15 U.S.C. § 1116.[FN1] After Motorola ob-
tained the *ex parte* seizure Order, plaintiffs com-
menced the present action for, inter alia, wrongful
application of an *ex parte* seizure order pursuant to
15 U.S.C. § 1116(d)(11). These actions have been
consolidated by Order of this Court. *ELSCO v.
Motorola, Inc.,* No. 88–4494 (E.D.Pa. Sept. 20,
1989).

Among the defendants named in the present ac-
tion are Raymond T. Cullen and Ronald B. Hauben,
who are or were representing Motorola in both the
present action and the consolidated action against
ELSCO, Snyderman, New Jersey Semiconductor,
and Hildebrandt.[FN2] In their amended Pretrial Memo-
randum, plaintiffs name Cullen and Hauben as wit-
nesses to be called at trial. Defendants have now
moved to strike this amendment on the grounds that
such an amendment would effectively disqualify
counsel under Pennsylvania's Rules of Professional
Conduct. Because the denial of the motion to strike
would effectively disqualify defense counsel, this
Court will treat the motion as a motion to disqualify.

*II. DISCUSSION*
Rule 3.7 of the Pennsylvania Rules of Profes-
sional Conduct provides:

(a) A lawyer shall not act as advocate at a trial in
which the lawyer is likely to be a necessary witness
except where:

(1) the testimony relates to an uncontested issue;

(2) the testimony relates to the nature and value
of legal services rendered in the case; or

(3) disqualification of the lawyer would work
substantial hardship on the client.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1990 WL 96202 (E.D.Pa.)
**(Cite as: 1990 WL 96202 (E.D.Pa.))**

**\*2** (b) A lawyer may act as advocate in a trial in which another lawyer in the lawyer's firm is likely to be called as a witness unless precluded from doing so by Rule 1.7 or Rule 1.9.

Pa.R.Prof.Cond. 3.7.[FN3]

The purpose of this rule is to separate the role of an attorney as an advocate on one hand and the role of a witness to give testimony on the other:

A witness is required to testify on the basis of personal knowledge, while an advocate is expected to explain and comment on evidence given by others. It may not be clear whether a statement by an advocate-witness should be taken as proof or as an analysis of the proof.

Pa.R.Prof.Cond. 3.7 comment.[FN4]

Before this Court addresses the core issue of whether Cullen may act as counsel for Motorola, a number of preliminary issues may be addressed perfunctorily. First, according to defendants' representations in their memorandum of law, Hauben is identified as "former counsel" in this matter and thus, he may be called as a witness under Rule 3.7(b), subject to Rules 1.7 and 1.9. Accordingly, defendants' Motion to Strike is denied to the extent that it seeks to strike the addition of Hauben as a witness for plaintiff.

Second, an attorney may continue to represent a client in an action in which he will be called as a witness up to the actual trial in the case. *See, e.g., Culebras Enters. Corp. v. Rivera–Ríos,* 846 F.2d 94, 99–101 (1st Cir.1988).[FN5] Thus, even if Cullen may not act as trial counsel for Motorola or the other defendants, he may continue to represent them up to the actual commencement of the trial.

And finally, the attorney-witness rule is inapplicable to attorneys representing themselves *pro se. See, e.g., Duncan v. Poythress,* 777 F.2d 1508, 1515 n. 21 (11th Cir.1985) (citing *O'Neal v. Bergman,* 452 A.2d 337, 344 (D.C.1982)).[FN6] Accordingly, even if Cullen may not act as trial counsel for Motorola or the other defendants, he and Hauben may represent themselves even though they will be called as plain-

tiffs' witnesses.

A. *Necessity*

Pursuant to Rule 3.7, Cullen should only be disqualified as trial counsel if he is "likely to be a *necessary* witness...." Rule of Professional Conduct 3.7 (emphasis added). A lawyer who is likely to be a necessary witness has been described as one " 'who has crucial information in his possession which must be divulged.' " *Anderson v. Reliance Standard Life Ins. Co.,* No. 86–3328, slip op. at 4 (E.D.Pa. July 27, 1988) (quoting *Universal Athletic Sales Co. v. American Gym, Recreational & Athletic Equip. Corp.,* 546 F.2d 530, 538–39 n. 21 (3d Cir.1976), *cert. denied,* 430 U.S. 984 (1977)). "Although whether counsel will actually testify is not determinative, the necessity standard requires more than mere speculation that counsel will do so." *Id.* (citation omitted).

For a number of reasons, this Court believes that Cullen is a necessary witness in this case and should be disqualified as trial counsel for Motorola or any other defendant except himself in this action and as trial counsel for Motorola in the consolidate action.[FN7] First, plaintiffs claim that Cullen drafted the affidavit of Charles Rawls with the knowledge that the affidavit was false. If true, this would be extremely relevant to show bad faith on Cullen's and Motorola's part, which, according to defendants, is a relevant consideration in determining whether the application for an *ex parte* seizure order was "wrongful."

**\*3** Plaintiffs also claim that Cullen and/or Hauben presented the oral application for the *ex parte* seizure order and that only they/he can testify as to the representations made to the Court since no court reporter was present. Again, this is extremely relevant to discover what representations were actually made to the Court in order to obtain the seizure order, especially since no transcript of the hearing is available.

In addition, since Cullen is a defendant in this case, denying plaintiffs the opportunity to call him as a witness denies plaintiffs the full opportunity to present their case to the jury. While this Court is hesitant to deny defendants their choice of counsel, it is equally, if not more, hesitant to deny plaintiffs every opportunity to present their case.[FN8]

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1990 WL 96202 (E.D.Pa.)
**(Cite as: 1990 WL 96202 (E.D.Pa.))**

And finally, Cullen raises the affirmative defense that his "conduct in this matter is privileged and cannot be the subject of Plaintiffs' claims or injury; alternatively, [his] conduct is immune from these claims." Affirmative Defense 8, Defendants' Answer at 13. While Cullen is under no burden to prove this defense, plaintiffs will most likely need to call Cullen to the stand in order to establish that this privilege does not attach. [FN9] An appropriate Order follows.[FN10]

*ORDER*

AND NOW, this 2nd day of July, 1990, upon consideration of defendants' Motion to Strike Plaintiffs' Amended Pretrial Memorandum, plaintiffs Electronic Laboratory Supply Company's and Jack Snyderman's response, and defendants' reply, IT IS HEREBY ORDERED that defendants' motion is DENIED.

FN1. The Honorable Edmund V. Ludwig granted the *ex parte* seizure Order in that case, which was subsequently transferred to this Court's calendar by Order dated September 23, 1988.

FN2. Motorola represents that Cullen is present counsel and Hauben is former counsel in this and the related action.

FN3. By Order dated May 23, 1990, the Eastern District of Pennsylvania amended Local Rule of Civil Procedure 14 to provide that "[t]he *Rules of Professional Conduct* adopted by this Court *are* the *Rules of Professional Conduct* adopted by the Supreme Court of Pennsylvania...." This reflects the fact that the Pennsylvania Code of Professional Responsibility was superseded by the Pennsylvania Rules of Professional Conduct.

FN4. The rational behind the lawyer-witness rule is further detailed in Ethical Consideration 9 to Canon 5 of the now-superseded Code of Professional Responsibility:

Occasionally a lawyer is called upon to decide in a particular case whether he will be a witness or an advocate. If a lawyer is both counsel and witness, he becomes more easily impeachable for interest and thus may be a less effective witness. Conversely, the opposing counsel may be handicapped in challenging the credibility of the lawyer when the lawyer also appears as an advocate in the case. An advocate who becomes a witness is in the unseemly and ineffective position of arguing his own credibility. The roles of an advocate and of a witness are inconsistent; the function of an advocate is to advance or argue the cause of another, while that of a witness is to state facts objectively.

42 Pa.C.S.A. EC 5–9 (Purdon 1987) (superseded by Pennsylvania Rules of Professional Conduct).

FN5. The Court in *Culebras Enterprises* concluded that a lawyer-witness could represent a party up to the trial on two grounds. First, the Court noted that the concerns surrounding a lawyer-witness "are absent or, at least, greatly reduced, when the lawyer-witness does not act as trial counsel, even if he performs behind-the-scenes work for the client in the same case." *Id.* at 100. The Court also concluded that the language of Rule 3.7 suggested that this was the appropriate result since it only proscribed a lawyer-witness from acting as an "advocate at a trial." *Id.* at 101.

FN6. While the Court's conclusion in *Duncan* that the lawyer-witness rule was inapplicable to *pro se* attorneys was based on Ethical Consideration 9 to Cannon 5 of the ABA Model Code of Professional Responsibility, this Court believes that the same result is appropriate for Rule of Professional Conduct 3.7.

FN7. Defendants spend a considerable portion of their briefs attacking plaintiffs' claims against Cullen. Such attacks are inapposite in the present motion and should be or should have been raised in a motion attacking the substance of the claims.

FN8. It is also relevant to note that Cullen has been a named defendant from the inception of this action and should have fairly an-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1990 WL 96202 (E.D.Pa.)
**(Cite as: 1990 WL 96202 (E.D.Pa.))**

ticipated this problem from the start.

FN9. As a final note, this Court believes that defendants will have little difficulty finding alternative trial counsel at Morgan, Lewis & Bockius—one of Philadelphia's largest law firms—who is able to represent defendants under Rule 3.7(b).

FN10. To the extent that defendants seek to strike plaintiffs' amended pretrial memorandum on the grounds that it lists furnace rec-

ords that plaintiffs intend to introduce, defendants' motion to strike is likewise denied.

E.D.Pa.,1990.
Electronic Laboratory Supply Co., Inc. v. Motorola, Inc.
Not Reported in F.Supp., 1990 WL 96202 (E.D.Pa.)

END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 2446529 (D.N.J.)
**(Cite as: 2007 WL 2446529 (D.N.J.))**

**H**
Only the Westlaw citation is currently available.

United States District Court,
D. New Jersey.
Audrey OSWELL, Plaintiff,
v.
MORGAN STANLEY DEAN WITTER & CO.,
INC., et al., Defendants.

Civil No. 06-5814 (JBS).
Aug. 22, 2007.

Charles A. Ercole, Esq., Lynn A. Collins, Esq.,
Klehr, Harrison, Harvey, Branzburg & Ellers, LLP,
Cherry Hill, NJ, for Plaintiff, Audrey Oswell.

A. Ross Pearlson, Esq., Jennifer Maria Rosa, Esq.,
Sills, Cummis, Epstein & Gross, P.C., Newark, NJ,
for Defendants, Morgan Stanley and Venture Holdings, Inc.

**OPINION**
SIMANDLE, District Judge.
*1 This matter is before the Court upon the motion of Defendant Morgan Stanley Dean Witter and Venture Holdings, Inc. ("Defendant") to disqualify counsel for Plaintiff Audrey Oswell ("Oswell") pursuant to New Jersey Rule of Professional Conduct 3.7 ("RPC 3.7"). RPC 3.7 can be used to disqualify an attorney on the grounds that the attorney will be a witness at trial. In this matter, Defendant seeks to disqualify four attorneys from the law firm representing Oswell (Klehr, Harrison, Harvey, Branzburg & Ellers, LLP) (the "Klehr Law Firm") but not the Klehr Law Firm itself.[FN1] Because members of the Klehr Law Firm Charles Ercole, Esq. and Lynn A. Collins, Esq. had a limited participation in earlier conversations surrounding this dispute, and other witnesses may be available to Defendant if it needs to establish the contents of those discussions at trial, Defendant has failed at the present time, to meet its burden of proving that either Ercole or Collins are "likely to be a necessary witness" at trial (as required by RPC 3.7(a)). Thus, the Court will deny Defendant's motion to disqualify as to Ercole and Collins for the reasons expressed below.

FN1. Defendant does not seek to disqualify

the entire Klehr law firm. In addition, according to counsel for Oswell, attorneys Ira Gubernick and Leonard Klehr are members of the Klehr Law Firm's corporate and transactional practices and will not appear as counsel in this matter. Accordingly, as counsel for Defendant conceded at oral argument, no issue exists as to Mr. Gubernick and Mr. Klehr, since neither is serving, or will serve, as trial counsel for Oswell.

**I. BACKGROUND**
This matter involves two consolidated cases. The first is *Oswell v. Morgan Stanley Dean Witter & Co. et al.* (Civil No. 06-5814), which arises out of discussions Oswell allegedly participated in with Defendant relating to the purchase of certain property in Atlantic City (the "Property") and the contemplated development of that Property into a casino. Oswell claims that she entered into a deal with Defendant in which Defendant would employ her as the chief executive officer of a new casino that she and Defendant would develop on the Property. Oswell claims that (1) Defendant's promise purportedly induced her to resign from her then current employment as chief executive officer of Resorts International, Inc. ("Resorts") and (2) that she provided contacts and information to Morgan Stanley and negotiated the purchase of the Property on Defendant's behalf.

The second action is *Resorts Int'l Hotel, Inc. v. Morgan Stanley Dean Witter & Co.* (Civil No. 07-105) in which plaintiff Resorts alleges that Defendant induced Oswell, during her tenure as chief executive officer of Resorts, to divert the opportunity to purchase the Property away from Resorts and for Defendant's behalf. Further, Resorts argues that Defendant induced Oswell to: (1) use her knowledge, experience and contacts in the Atlantic City casino industry to negotiate a purchase price of the Property; (2) resign from Resorts and (3) secure a release from Resorts under false pretenses. In this action, Defendant brought a third-party complaint against Oswell, asserting claims for indemnification, contribution and fraud (in the event Defendant is held liable to Resorts) arising out of representations Oswell made to Defendant, through her attorneys, that she had presented to Resorts the opportunity to develop the property and that they had rejected it. Defendant and Oswell ultimately stipulated that the third-party complaint should be dismissed without prejudice on July

Not Reported in F.Supp.2d, 2007 WL 2446529 (D.N.J.)
**(Cite as: 2007 WL 2446529 (D.N.J.))**

17, 2007. [Docket Item No. 31, 36.]

**\*2** Defendant claims that (1) the conversations between Oswell's attorneys, on the one hand, and Defendant's attorneys, on the other, relating to the legal impediments to the "deal" between Oswell and Morgan Stanley and (2) what, if anything, Oswell told Resorts regarding the opportunity to purchase the Property and what her attorneys told Defendant's counsel regarding these discussions, are highly material to the claims and defenses herein. Specifically, Defendant claims:

• Oswell's attorneys (Charles Ercole, Lynn Collins, Ira Gubernick and Leonard Klehr) participated in multiple telephone conversations and email exchanges relating to the topics with various attorneys from the law firm of Shefsky & Froelich (the "Shefsky firm") who were acting on behalf of Defendant in connection with the purchase of the Property;

• On February 14 and 16, 2006, Ercole and Collins participated in two half-hour, substantive conference calls with the Shefsky firm where the parties discussed "numerous legal impediments" to the deal arising due to Oswell's then-current employment with Resorts. (Def.'s Reply at 3.) According to lawyers at the Shefsky law firm, on February 14, Ercole and Collins (among others) represented that Oswell had advised a high-ranking executive at Resorts about the Property and that Resorts was not interested in purchasing the Property;

• On February 16, 2006, Ercole and Collins participated in a conference call and argued with representatives of the Shefsky firm that Morgan Stanley would not be at risk of a tortious interference action should it move ahead with the deal.

Oswell presents a version of events (and the role of Oswell's counsel) that is considerably different than the one presented by Morgan Stanley. For example:

• According to the affidavit by Lynn Collins, Collins and Ercole participated in one telephone call with attorneys for Defendant, which occurred on February 14, 2006. The call was "brief" and "only involved a very general and cursory discussion of New Jersey case law. on the issue of tortious inter-

ference." (Pl.'s Opp. Br. at 8.);

• After the call, Collins sent an email to a Shefsky attorney forwarding a few general case cites on New Jersey tortious interference and non-compete agreements under New Jersey law;

• Aside from this exchange, "at no time prior to the filing of the Complaint were either Mr. Ercole or Ms. Collins ever involved in (or witness to) any communications with [Defendant] or its attorneys related to the status of the agreement between [Oswell] and [Defendant], the terms of the agreement, [Oswell's] discussions with Resorts' management...."

(Pl.'s Br. at 9.)

## II. DISCUSSION

### A. *Legal Standard*

A court may disqualify an attorney where it is necessary to enforce the court's disciplinary rules. *See Kaselaan & D'Angelo Assocs., Inc. v. D'Angelo,* 144 F.R.D. 235, 243 (D.N.J.1992); *Sherwood Group, Inc. v. Ritterreiser,* No. 90-2414, 1991 U.S. Dist. LEXIS 7147 (D.N.J. May 20, 1991); *see In re Snyder,* 472 U.S. 634, 643 (1985)(federal courts have inherent authority to discipline attorneys). Here, the relevant disciplinary rule is RPC 3.7(a) which states:

**\*3** (a) a lawyer shall not act as advocate at a trial in which the lawyer is likely to be a necessary witness except where:

(1) the testimony relates to an uncontested issue;

(2) the testimony relates to the nature and value of legal services rendered in the case; or

(3) disqualification of the lawyer would work substantial hardship on the client.

RPC 3.7; *see also Main Events Prods. v. Lacy,* 220 F.Supp.2d 353, 355 (D.N.J.2002)(RPC 3.7(a) is a prohibition against an attorney-witness acting as an "advocate at trial.") The purpose of RPC 3.7(a) is "to prevent a situation in which at trial a lawyer acts as an attorney and a witness, creating the danger that the

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 2446529 (D.N.J.)
**(Cite as: 2007 WL 2446529 (D.N.J.))**

factfinder (particularly if it is a jury) may confuse what is testimony and what is argument...." *Main Events Prods.,* 220 F.Supp.2d at 357. An attorney is "likely to be a necessary witness only where he has crucial information in his possession which may be divulged." *Garza v. McKelvey,* No. 89-895, 1991 U.S. Dist. LEXIS 311, *6 (D.N.J. Jan. 2, 1991). FN2

> FN2. Under *Main Events Prods.,* Judge Debevoise held that the phrase "acts as advocate at trial" as set in the RPC 3.7, applies only to an attorney's participation at trial before a jury and would not serve to bar an attorney from participating in pretrial proceedings. *Main Events Prods.,* 220 F.Supp.2d at 357 ("In light of the clear language of the Rule, [the attorney] should not have been disqualified from participating in pre-trial matters. This construction of RPC 3.7 not only is in accord with the plain language of the Rule, it also is consistent with its intent.") As discussed in Section III.C., *infra,* this Court agrees that RPC 3 .7 is a prohibition against acting as an advocate at trial, not in pretrial proceedings. The inherent authority of the Court, or other Rules of Professional Conduct, may serve to bar counsel from pretrial proceedings under circumstances not present here.

Generally speaking, motions to disqualify are viewed with disfavor as disqualification is a remedy with broad implications. *See Carlyle Towers Condo. Ass'n v. Crossland Sav.,* 944 F.Supp. 341, 345 (D.N.J.1996); *Spinello Cos. v. Metra Indus.,* No. 05-5075, 2006 U.S. Dist. LEXIS 41875 (D.N.J. June 22, 2006). The party seeking disqualification bears the burden of showing that continued representation by the lawyer would violate the disciplinary rules. *See Kroungold v. Triester,* 521 F.2d 763, 766 (3d Cir.1975).

In addition, the party seeking to disqualify an attorney must do more than simply make representations that a lawyer is a necessary witness for the attorney to be disqualified. *J.G. Ries & Sons, Inc. v. Spectraserv, Inc.,* 384 N.J.Super. 216, 230 (App.Div.2006)*(*"Such a mere representation, however, does not satisfy the threshold requirements of RPC 3.7, which specifies a likelihood that a lawyer will be a necessary witness.") Indeed, the party seek-

ing to disqualify must put forth evidence that establishes the likelihood that the attorney will be a necessary witness at trial and if it is unclear from the record as to whether or not the attorney's testimony is necessary, the motion should be denied. *See Host Marriott Corp. v. Fast Food Operators, Inc.,* 891 F.Supp. 1002, 1010 (D.N.J.1995).

**B.** *Disqualification as Trial Counsel*

Defendant first argues that Ercole and Collins should be disqualified from serving as trial counsel because they are likely to be necessary witnesses in this matter. According to Defendant, Oswell's counsel have information regarding (1) what, if any, terms were discussed and/or agreed to between Defendant and Oswell relating to the agreement; (2) whether any agreement was in fact entered into between Oswell and Defendant; (3) what Oswell and counsel told Resorts regarding the Property and what Resorts' response was; and (4) what Oswell and/or her counsel told Defendant and the Shefsky firm about what Oswell told Resorts about the Property and Resorts' response. As an example, Defendant contends that counsel has personal knowledge relating to the drafting and sending of the term sheet to Defendant and the discussions of the term sheet that are directly related to the issue of whether Oswell and Defendant had ever agreed to any terms of a purported contract.

**\*4** Oswell counters by arguing that, under New Jersey law, an attorney can be excluded under RPC 3.7 only if his or her testimony is shown "to be truly necessary." (Pl.'s Opp. Br. at 12.) Oswell argues that, in this matter, neither Ercole or Collins have any relevant or material evidence or testimony that would make them "necessary" witnesses at trial for several reasons. First, according to Oswell, neither was present during any substantive communications or negotiations between Oswell and Defendant. Thus, neither Ercole nor Collins have any knowledge of either (1) what Oswell's attorneys were told by Defendant's attorneys related to Oswell's inability to enter into any deal or (2) what Oswell's attorneys told Defendant's attorneys relating to Oswell's alleged presentation of the property to Resorts. Second, according to Oswell, to the extent testimony about the February 14, 2006 conversation (regarding New Jersey law relating to tortious interference) between counsel becomes relevant to the case, Ercole's and Collins' testimony would be entirely duplicative and cumulative of other testimony or evidence that is available.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 2446529 (D.N.J.)
**(Cite as: 2007 WL 2446529 (D.N.J.))**

Indeed, Mr. Gubernick (Klehr Harrison's transactional attorney) or attorneys from the Shefsky law firm are also available as witnesses to testify regarding the contents of the February 14, 2006 call.

The Court holds that Defendant has failed meet its burden of showing that Ercole and Collins are likely to be necessary witnesses at trial. Under New Jersey law for purposes of RPC 3.7, a witness is "truly necessary" if there are no documents or other witnesses that can be used to introduce the relevant evidence. *See e.g., J.G. Reis & Sons, Inc., 384 N.J.Super. 216 (App.Div.2006)* (denying motion to disqualify under RPC 3.7 where documents could be introduced by the testimony of an individual who received the letter, rather than the attorney). Indeed, where knowledge possessed by an attorney is equally possessed by other witnesses, disqualification is not appropriate. *See Spinello Cos.,* 2006 U.S. Dist. LEXIS 41875 at* 10. Defendant has not established that evidence relevant to Oswell's conversations with Resorts or the negotiations between Oswell and Defendant rest solely within the possession of Ercole or Collins that would make either of them the only witness, or even the primary witness, available to testify regarding these matters. Instead, their testimony is likely to be duplicative as counsel for Defendant (John Kennedy from the Shefsky law firm) or Oswell (Gubernick or Klehr) can testify regarding the same facts as Oswell and Collins. Indeed, Defendant's argument about hearing facts from Oswell's own attorney regarding the February 2006 conversations is unavailing as Gubernick (rather than Ercole and Collins) would be available to testify as a witness. Also, to the extent either attorney is shown to possess unique evidence for trial, it is possible that disqualification may be avoidable through a stipulation of what that testimony would be. Consequently, without more evidence as to Ercole's and Collins' necessity as witnesses,[FN3] the Court finds that their continuing as counsel for Oswell will not violate RPC 3.7(a) and, therefore, the Court will not deprive Oswell of her choice of counsel.[FN4]

FN3. Defendant is free to obtain further discovery of the relevant knowledge of Ercole and Collins in the disputed conversations with Defendants' counsel. While Ercole and Collins are not disqualified under RPC 3.7, neither are they immunized from discovery of their relevant, non-privileged conversa-

tions bearing upon the substance of Oswell's claims.

FN4. Furthermore, Plaintiff has made her choice between having Ercole and Collins as her trial attorneys or as her trial witnesses. In preserving their roles as her trial attorneys, Plaintiff has foregone the opportunity to adduce their presumably favorable trial testimony. In the absence of their discovery depositions, the full contours of their prospective testimony is not presently known. But upon the present record, the Court is satisfied that denial of disqualification does not confer either an undue advantage to Plaintiff or an unfair prejudice upon Defendant.

**C. Disqualification from Pre-trial Matters**
**\*5** Defendant next argues that RPC 3.7 prevents Ercole and Collins from serving as Oswell's attorneys even in pre-trial matters. Defendant cites cases from outside of this jurisdiction holding that "disqualification from pretrial matters may be appropriate ... where that activity includes obtaining evidence which, if admitted at trial, would reveal the attorney's dual role [of witness and attorney]." *Lowe v. Experian,* 328 F.Supp.2d 1122, 1126 (D.Kan.2004)(internal quotations omitted)(interpreting Kansas RPC 3.7 which contains identical language to New Jersey RPC 3.7); *see also World Youth Day, Inc. v. Famous Artists Merchandising Exchange, Inc.,* 866 F.Supp. 1297 (D.Colo.1994). Defendant argues that Ercole and Collins are likely to be necessary witnesses in both the *Oswell* and *Resorts* matters and their participation in depositions-similar to as if they testified at trial and served as trial counsel-is likely to create the potential for jury confusion that RPC 3.7 is designed to prevent. In her opposition, Oswell argues that, under *Main Events,* Ercole and Collins should not be disqualified from pre-trial matters because RPC 3.7(a) is directed only at disqualifying counsel from serving as trial counsel. *See Main Events,* 220 F.Supp.2d at 356-57.

The Court agrees with Oswell. In *Main Events,* Judge Debevoise specifically rejected the notion that RPC 3.7(a) also serves to disqualify an attorney from pre-trial proceedings, holding that "RPC 3.7(a) is a prohibition only against acting as an advocate at a trial," and "RPC 3.7 does not apply to pre-trial proceedings." *Id.* at 357 (internal quotations omitted).

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 2446529 (D.N.J.)
**(Cite as: 2007 WL 2446529 (D.N.J.))**

Indeed, the court in *Main Events* stated:

> The analysis of RPC 3.7 in [ *Freeman v. Vicciarelli,* 827 F.Supp. 300 (D.N.J.1993) ] is predicated on various New Jersey cases ... which relied on older versions of the advocate witness rule found in the Disciplinary Rules of the Code of Professional Responsibility.
>
> RPC 3.7(a) is a prohibition only against acting as an "advocate at a trial...." The conclusion drawn in *Freeman* that RPC 3.7 applies to all pre-trial activity is at odds with the clear language of RPC 3.7.
>
> While there is no clear authority from the New Jersey Supreme Court regarding this issue, a number of other courts interpreting RPC 3.7 have concluded that an attorney who will testify at trial need not be disqualified from participating in pre-trial matters.... **This construction of RPC 3.7 not only is in accord with the plain language of the Rule, it also is consistent with its intent. The Rule is designed to prevent a situation in which at *trial* a lawyer acts as an attorney and as a witness, creating the danger that the fact finder (particularly if it is a jury) may confuse what is testimony and what is argument, and otherwise creating an unseemly appearance at *trial*.** Limiting the disqualification to advocacy at trial achieves these objectives and at the same time respects a client's right to be represented generally by an attorney of his choice.

> **\*6** *Id.* 356-57 (emphasis added) (citations omitted).

Thus, this Court will adhere to plain language of RPC 3.7 and follow the holding of *Main Events* in concluding that Ercole and Collins can also participate in pre-trial matters. Regardless of whether Ercole and Collins are disqualified as trial counsel, Ercole and Collins should not be disqualified from pre-trial matters under New Jersey law interpreting RPC 3.7(a).

### III. *CONCLUSION*

For the reasons set forth in this Opinion, this Court will deny Defendant's motion to disqualify Oswell's counsel as to Charles Ercole and Lynn Collins. If circumstances change, this motion for disqualification may be renewed prior to the final pretrial conference.

The accompanying Order is entered.

D.N.J.,2007.
Oswell v. Morgan Stanley Dean Witter & Co., Inc.
Not Reported in F.Supp.2d, 2007 WL 2446529 (D.N.J.)

END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp., 1991 WL 3302 (D.N.J.)
**(Cite as: 1991 WL 3302 (D.N.J.))**

**H**
Only the Westlaw citation is currently available.

United States District Court, D. New Jersey.
David C. **GARZA** and Diane M. **Garza**, Plaintiffs,
v.
Patricia **McKELVEY**, Defendant.

Civ. No. 89–895 (CSF).
Jan. 2, 1991.

OPINION
CLARKSON S. FISHER, District Judge.
**\*1** Before the court is a motion by defendant, Patricia McKelvey, against plaintiff, David Garza, to disqualify him from acting as trial counsel in this case. The defendant also brings a motion to bar plaintiffs from pursuing rescission as a remedy. For the following reasons, defendant's motion to disqualify is denied and her motion to bar rescission is granted.

Facts
Defendant Patricia McKelvey is a professional horse trainer and the manager of a stable located in Whitehouse Station, New Jersey. She is paid a small salary and in lieu of additional monies receives the free use of certain stalls. She also engages in the parttime occupation of buying and selling show horses which she keeps in these stalls.

Defendant alleges that she purchased Gipper in September 1986 at an auction in Ohio from Skip Fletcher. She further alleges that during the two years she owned Gipper, she regularly trained him and brought him to approximately ten horse shows where he successfully competed as a hunter, which is a type of jumping competition for show horses.

In March 1988, plaintiff Diane Garza came to Lakefield with her agent, James Wray, to look at certain show horses which defendant had for sale. Plaintiff claims she told defendant that she wanted a quiet, amateur's hunter. Plaintiff rode several horses which defendant showed her and was also videotaped while riding these horses. After reviewing the video tapes and allegedly being informed Gipper was quiet and well mannered, plaintiff and Wray decided plaintiff should purchase defendant's horse, Gipper. Plaintiff paid defendant $13,500.00 and paid Wray $1,350.00 for his services.

Plaintiffs brought Gipper back to their home in Texas but soon became dissatisfied with his temperament and abilities. Plaintiffs claim that the horse was very nervous, easily spooked and knew very little about jumping, a trait McKelvey had said Gipper displayed. In addition, the horse immediately displayed an extremely dangerous, twisting buck which plaintiffs videotaped. After repeated failed attempts to obtain relief from defendant, plaintiffs and their agent, Wray, reached an agreement whereby he would board Gipper at his farm in Pennsylvania, at his expense, until a solution could be reached. Finding none, Wray sent Gipper to defendant's place of business. Defendant alleges that there was some type of an agreement whereby she had no obligation but would try to sell Gipper or replace him and would charge board for the time Gipper was with defendant. On December 15, 1988, defendant allegedly demanded payment of her board bill which plaintiffs failed and refused to do. On March 7, 1989, defendant then notified plaintiff of the status of their board bill and again demanded action. Plaintiff again took no steps to pay defendant's board bill or to have Gipper removed from defendant's farm and return to Wray or to plaintiff in Texas.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

In a letter dated October 26, 1989, plaintiffs were notified that defendant's board fees had reached the point where defendant could no longer afford to keep Gipper and that Gipper would be sold at public auction on November 13, 1989, pursuant to New Jersey statute. On November 8, 1989, at plaintiffs' request, a conference call between the parties and Judge Wolfson occurred. Defendant alleges that the auction was discussed during this conference but plaintiffs nonetheless acquiesced to the auction which was conducted as scheduled on November 13, 1990.

**\*2** On March 13, 1989, plaintiffs filed an original complaint which sought actual and punitive damages arising from breach of contract, common law fraud and consumer fraud. Defendant answered and counterclaimed for the expenses she incurred in boarding Gipper after plaintiffs abandoned him at her farm. As a result of defendant's auction of Gipper, plaintiffs filed a first amended complaint on or about March 6, 1990, which included an additional count to set aside the auction. On October 11, 1990, the Honorable Freda L. Wolfson, United States Magistrate, held a pretrial conference attended by attorney Robert Golden for defendant and an attorney from Mr. Nizolek's firm for plaintiff. At that time plaintiff David Garza's intention to be both trial counsel and a witness, and defendants' objections thereto were discussed. Judge Wolfson ordered plaintiff to notify the court by October 31, 1990, as to whether he intended to participate a trial.

In a letter of October 25, 1990, plaintiff David Garza notified the court that he intended to act as lead counsel and attorney and would not testify to any material or disputed facts. By way of letter dated October 31, 1990, defendant repeated her objections to Mr. Garza being trial counsel since defendant will be calling him as a witness. By way of letter dated November 2, 1990, Judge Wolfson instructed defendant to file the within motion. This motion seeks to disqualify David Garza as trial counsel.

### Analysis
### I

In general, the standards of professional conduct prescribed for lawyers practicing in the federal courts are governed by federal disciplinary rules. *International Business Mach. corp. v. Levin,* 579 F.2d 271, 279 n. 2 (3d Cir.1978). Local Rule 6 of this court has adopted the Rules of Professional Conduct of the American Bar Association as revised by the New Jersey Supreme Court, subject to modifications by federal statute, regulation, court rule or decision of law. Defendants' motion will be evaluated accordingly.

Rule of Professional Conduct 3.7 provides:

(a) A lawyer shall not act as advocate at a trial in which the lawyer is likely to be a necessary witness except where:

(1) The testimony relates to an uncontested issue;

(2) The testimony relates to the nature and value of legal services; or

(3) Disqualification would work substantial hardship on the client.

This court may disqualify attorneys when necessary to enforce the disciplinary rules it has adopted. *In re Snyder,* 472 U.S. 634 (1985); *United States v. Miller,* 624 F.2d 1198, 1200–01 (3d Cir.1980).

The party seeking to have a counsel disqualified—defendant, in this case—bears the burden of establishing that continued representation would contravene the Professional Code. *Kroungold v. Triester,* 521 F.2d 763, 766 (3d Cir.1975) (movants failed to specify in what respect counsel's testimony would violate rules); *Commercial Credit Business Loans, Inc. v. Martin,* 590 F.Supp. 328, 335 (E.D.Pa.1984) (party seeking disqualification must make a clear showing that continued representation would be impermissible). In addition the court should resolve all doubts as to the existence of a rules violation in favor of disqualification. *International Business Mach. Corp.,* 579 F.2d at

283. Further, the Third Circuit has emphasized the importance of avoiding not only actual professional misconduct, but the mere appearance of impropriety as well. *Akerly v. Red Barn System, Inc,* 551 F.2d 539, 544 (3d Cir.1977).

**\*3** For purposes of rule 3.7, an attorney is likely to be a necessary witness only where he has crucial information in his possession which may be divulged. *Martin,* 590 F.Supp. at 335. To make a determination of whether Garza has crucial information, this court must evaluate what plaintiffs need to prove to prevail. The bulk of plaintiffs' claims arise from the sale by defendant of Gipper to the plaintiff Diane Garza: (1) breach of contract and common law; (2) fraud; and (3) New Jersey Consumer Fraud. The claim of conversion arising from the auction is the only claim not connected to the original contractual transaction.

As to the breach of contract claim, defendant argues that she will have to call David Garza to testify to negotiations of the letter agreement between Garza and Wray on June 30, 1988. Defendant deems this necessary as she will be arguing that this agreement constituted a ratification of the sale of "Gipper" and thus he must be disqualified as counsel. The court finds this argument unpersuasive. Defendant has failed to meet her burden of showing that Garza's representation is impermissible. First, no jury is present to be confused by Garza's dual advocate—witness status. Second, as to himself, Garza is a pro se litigant, and pro se litigants routinely testify at trial. Third, as to his representation of his wife, defendant's claims are tenuous at best. Plaintiffs have stated that David Garza need not testify to prove their case and this court agrees. When an attorney's testimony is unnecessary and only defendant seeks to have him testify, he will only be precluded from doing so if his testimony would be prejudicial to his client. *Saber v. Finance America Credit Corp.,* 1986 W.L. 1553, at p. 6 (E.D.Pa.) Further, the rule was not designed to permit a lawyer to call opposing counsel as a witness and thereby disqualify him as counsel. *Zions First Nat'l Bank v. United Health Clubs, Inc.,* 505 F.Supp. 138 (E.D.Pa.1981). This court thus finds that defendant's motion must be denied.

II

Defendant also seeks to have this court bar rescission as an available remedy for plaintiffs. Although it is true that plaintiffs did not plead rescission, this court does not rule upon this ground. Rather, even if plaintiffs had pled rescission, they would not be entitled to this remedy as a matter of law. Rescission is an equitable remedy that is available only in limited circumstances. To grant rescission, the court "must be able to return the parties to the ground upon which they originally stood." *Hilton Hotel Corp. v. Piper Co.,* 214 N.J.Super 328, 336 (Ch.Div.1986). An attempt to return these parties to the positions they held before the original horse sale is impossible because Gipper was auctioned by defendant. Accordingly, this court grants defendant's motion and forecloses plaintiffs from proceeding with the rescission claim at trial. An order accompanies this opinion. No Costs.

*ORDER*

This matter having been opened to the Court by Robert H. Golden, Esq., attorney for defendant, by way of Notice of Motion; and the Court having considered the papers filed in support of and in opposition to defendant's requested relief, and good cause having been shown,

**\*4** IT IS on this 2nd day of January, 1991,

ORDERED, that plaintiff David Garza may act as trial counsel in this matter; and it is further

ORDERED, that plaintiffs may not proceed at trial on the issue of rescission of the subject contract.

D.N.J.,1991.
Garza v. McKelvey
Not Reported in F.Supp., 1991 WL 3302 (D.N.J.)

END OF DOCUMENT

Not Reported in A.3d, 2011 WL 2566105 (N.J.Super.A.D.)
**(Cite as: 2011 WL 2566105 (N.J.Super.A.D.))**

Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.

Superior Court of New Jersey,
Appellate Division.
WELLINGTON PLACE CONDOMINIUM ASSO-
CIATION, Plaintiff,
v.
Marie CARTY, Defendant–Appellant,
and
Henry Hammond, Defendant–Respondent,
and
Lauren Carty, Property Maintenance Associates,
Inc., a New Jersey Corporation, Christopher Reid,
Amboy National Bank, Commerce Bank, n/k/a TD
Bank, N.A., Wachovia Bank, N.A., Merrill Lynch
or Merrill Lynch, NMTC Corporation, Bank of
America, f/k/a Fleet Bank, Community Association
Underwriters of America, Inc., Continental Casu-
alty Company, Zurich American Insurance Com-
pany, St. Paul Fire & Marine Insurance Company,
Quincy Mutual Fire Insurance Company, Travelers
Casualty & Surety Company, Greater New York In-
surance Company, Creative Insurance Services,
Inc., t/a Creative Agency Group, Jacobson, Gold-
farb & Scott, Inc., t/a JGS Insurance Agency and
Lubowicki Insurance Agency, Defendants.

Argued June 8, 2011.
Decided June 30, 2011.

On appeal from the Superior Court of New Jersey,
Law Division, Monmouth County, Docket No.
L–4020–08.

Edwin R. Matthews argued the cause for appellant
(Bourne, Noll & Kenyon, attorneys; Mr. Matthews,
on the briefs).

Andrew T. Walsh argued the cause for respondent
(Chamlin, Rosen, Uliano & Witherington, attor-
neys; Charles J. Uliano, of counsel; Mr. Walsh, on

the brief).

Before Judges PAYNE and BAXTER.

PER CURIAM.
**\*1** By leave granted, defendant Marie Carty
(Marie) FN1 appeals from a January 7, 2011 Law
Division order that **disqualified** her attorney, Ed-
win R. Matthews, and his firm Bourne, Noll &
Kenyon, from representing her in the present matter
based upon the judge's conclusion that Matthews
had a conflict of **interest**. We reverse.

FN1. We designate Marie Carty by her
first name to differentiate her from her
daughter, Lauren Carty, who is also a de-
fendant.

I.

The judge's conclusion that Matthews's **dis-
qualification** was required arises from a matter
having its genesis in 2004. The question before us
is whether Matthews's representation of Henry
Hammond in 2004 bars Matthews from represent-
ing Marie in 2010, in light of the fact that Ham-
mond and Marie participated in a real estate trans-
action in 2004 during which Matthews represented
Hammond. Hammond and Marie are co-defendants
in the present matter.

In August 2004, Matthews was retained to rep-
resent Hammond, as well as Lauren Carty and
Christopher Reid, who was Lauren's husband, in
connection with their purchase of a residential
property in Little Silver. The total purchase price
was $555,000. Although all three applied for the
$500,000 mortgage, the mortgage was issued solely
in Hammond's name, because he was the only per-
son qualified. Although the original contract pur-
chasers were Hammond, Lauren and Reid, the title
insurance company insisted that only Hammond
take title to the property because he was the only
person named on the mortgage. Hammond's pur-

Not Reported in A.3d, 2011 WL 2566105 (N.J.Super.A.D.)
**(Cite as: 2011 WL 2566105 (N.J.Super.A.D.))**

chase of the Little Silver property closed on September 15, 2004, with Matthews as his attorney.

At a hearing conducted on Hammond's motion to disqualify Matthews, Hammond testified that the only time he and Matthews met concerning the 2004 real estate transaction was at the closing that took place in Florham Park, at which Marie was also present. According to Hammond, he did not learn that he would be the sole purchaser of the property until Marie told him so in the car on the way to Matthews's office. Matthews was not present in the car.

Hammond contradicted himself on the question of whether Marie repeated that information in Matthews's presence. Regardless of when he first learned that he would be the sole party on the mortgage, and whether Matthews was present during Hammond's discussion of the subject with Marie, Hammond does not contend that he provided any confidential information to Matthews during the real estate transaction involving the Little Silver property. Matthews did, however, review the closing documents with him, and acted as the settlement agent.

We now describe the relevant facts concerning the present litigation. In 1986, Marie served as the property manager for the Wellington Place Condominium Association (Association), an entity whose membership consists of condominium owners at One Wellington Place in Aberdeen. When Marie began her service as property manager, she was an employee of Wellington Place; however in 2000 or 2001, she opened her own property management firm known as Property Maintenance Associates, Inc. (PMA), through which she supplied property management services to the Association. While serving as the on-site property manager for the Association, her duties included collecting maintenance fee payments, hiring contractors and paying the bills submitted by contractors and vendors. In 2001 or 2002, Marie assigned to her daughter Lauren the responsibilities of on-site manager, at which time Lauren took over the duties pre-

viously performed by Marie.

**\*2** Beginning in August 2006, contractors began contacting members of the Association's Board of Trustees regarding invoices they had submitted that had remained unpaid for a considerable period of time. In September 2006, the pool contractor notified a Board member that when he received checks from PMA in payment for services rendered, there were insufficient funds in the Wellington Place account to cover the amount of the checks.

Also in September 2006, an employee of Brown & Brown Insurance contacted Board member Artie Martino to report that the premises liability insurance issued by Brown & Brown to the Association was in danger of lapsing because the premium remained unpaid. Brown & Brown advised Martino that Lauren had provided various excuses for the lack of payment, ranging from problems with the mail, to the bank having made a wire transfer to the wrong account number.

Martino confronted Marie about these financial irregularities, directed her to attend the next Board meeting on September 23, 2006 and to bring with her all of the financial records of the Association for the past year. At the Board meeting, neither Marie nor Lauren provided the information Martino had requested.

His suspicions heightened, Martino, along with Board member, Pat Dyer, reviewed the Association's financial records, and discovered numerous financial improprieties, including bank statements showing that Lauren had made unauthorized cash withdrawals from the Association's checking account, and had, without permission, obtained credit cards in the name of Wellington Place and was using them for personal shopping. Dyer and Martino also discovered that the former landscaping contractor for Wellington Place had obtained a default judgment against Wellington Place in the amount of $86,000.

Page 3

Not Reported in A.3d, 2011 WL 2566105 (N.J.Super.A.D.)
**(Cite as: 2011 WL 2566105 (N.J.Super.A.D.))**

Hammond was the Treasurer of the Board at the time the financial irregularities were discovered in 2006, and had been serving in that capacity for many years. At no time during his lengthy term as Treasurer did he ever reveal that he had a familial relationship with Marie and Lauren.

Martino reported his findings to a detective at the Aberdeen Police Department. When Martino and another Board member went to Wachovia Bank in Holmdel to change the signatory on the checking accounts, they learned, for the first time, that Lauren had, without permission, taken out a line of credit in the amount of $21,000 in the name of Wellington Place, and that the line of credit was in default. Wachovia had become suspicious of Lauren's activities, and filed a report with the Holmdel Police Department. Both police departments, Holmdel and Aberdeen, forwarded their findings to the Monmouth County Prosecutor's Office, which ultimately obtained an indictment against Marie, Lauren and Reid. A forensic audit conducted at the request of the Association established that approximately $1,000,000 had been embezzled by PMA, Marie, Lauren, Reid, Hammond and possibly others. During the course of discovery in the criminal proceedings, detectives learned that Hammond was the long-time paramour of Marie and that Lauren was his daughter.

**\*3** On August 22, 2008, the Association filed suit against Marie, Lauren, PMA, Reid, Hammond, and numerous banks, financial institutions and insurance companies, alleging causes of action for theft, embezzlement, unlawful conversion, breach of fiduciary capacity and fraud. The Board sought compensatory and punitive damages.

Marie retained Matthews to represent her, and on October 14, 2008, Matthews filed an answer on her behalf, and asserted a number of crossclaims for contribution and indemnification against several of her co-defendants, including Hammond. On November 16, 2010, more than two years after Matthews had filed an answer on Marie's behalf, and more than two years after Hammond became aware

that Matthews was representing Marie in the present matter, Hammond filed a motion to disqualify Matthews, citing Rule of Professional Conduct ( *RPC* ) 1 .9, which concerns conflicts of interest with former clients. The judge conducted an evidentiary hearing on January 4, 2011 followed by oral argument three days later.

In an oral opinion rendered on January 7, 2011, the judge made findings of fact concerning the testimony he had heard three days earlier. The judge prefaced his remarks by stating that he found two portions of Hammond's testimony to be "quite frankly incredible," namely: 1) Hammond's claim that he did not learn until he and Marie were driving to Matthews's office for the closing that he would be the only party obligated on the mortgage; and 2) that Hammond would unwillingly obligate himself on a mortgage loan in excess of $400,000.

The judge then observed that Hammond's motion to disqualify Matthews should not be granted unless, as the Supreme Court held in *City of Atlantic City v. Trupos*, 201 *N.J.* 447, 467 (2010), Matthews's prior representation of Hammond was both relevant and material to Matthews's subsequent representation of Marie. Analyzing that issue, the judge stated:

But the problem is, in this court's mind, that the switcheroo ... between Lauren and Hammond was done with what would appear to be Mr. Matthews's knowledge. And ... that property is the subject of where the theft and where the money went.... FN2

> FN2. The judge referred in his findings of fact to testimony establishing that some of the money Lauren diverted from the Association was used to improve the Little Silver property.

....

But what does it ultimately get down to? ... Mr. Matthews at some point, because of Marie Carty's

Not Reported in A.3d, 2011 WL 2566105 (N.J.Super.A.D.)
**(Cite as: 2011 WL 2566105 (N.J.Super.A.D.))**

testimony at her deposition [that Hammond was aware well in advance that he would be the only party named on the mortgage, and was agreeable to that arrangement,] and because of Henry Hammond's testimony in front of this [c]ourt [that he did not learn of the switch until he and Marie were driving to Matthews's office for the closing], ... there is a wide difference between their ... positions on what happened here.

And there is a big allusion to Mr. Matthews being part and parcel of the conversation that took place about this switch. Obviously, that's where the problem arises because then Mr. Matthews does become a witness. I accept his representation ... as an officer of the [c]ourt that nothing happened. That he simply was the closing agent and it was a routine real estate closing.

**\*4** But because of their testimony, they've put his testimony, they've made him a witness, whether they like it or not....

But be that as it may, I'm satisfied that Mr. Matthews has a conflict that can't be waived. It can't be distinguished away. And ... he's going to have to be disqualified as counsel.

Thus, as is evident from the judge's remarks, the sole basis upon which he disqualified Matthews was his belief that Matthews would become a witness in the litigation between the Association, Marie, Lauren, and Hammond, and would be required to provide testimony on the circumstances under which Hammond became the sole party named on the mortgage for the Little Silver property in 2004.

The judge signed a confirming order on January 11, 2011, which disqualified Matthews as well as his firm. The order stayed the disqualification of Matthews for sixty days to permit Marie to seek interlocutory review from this court. After we granted leave to appeal on March 2, 2011, the judge extended the stay indefinitely, pending the disposition of the appeal.

On appeal, Marie maintains: 1) there is no conflict of **interest** that would **disqualify** Matthews or his law firm from representing her in the present matter, and *RPC* 1.9 is inapplicable; 2) *RPC* 3 .7, which concerns trial counsel becoming a witness, does not require Matthews's **disqualification**; 3) the application to **disqualify** Matthews should have been denied because it was not brought in good faith; and 4) the judge erred in holding an evidentiary hearing.

II.

*RPC* 1.9 is the section of the Rules of Professional Conduct that controls an attorney's ability to represent a client when there is a conflict of interest with a former client. *RPC* 1.9 will not result in the disqualification of an attorney unless three elements are present: a past client whom the lawyer "represented" in a matter; a present client whose interests are "materially adverse" to those of the past client; and a current matter that is the "same" or "substantially related" to the matter in which the lawyer represented the past client. *RPC* 1.9. Because it is undisputed that Hammond is a past client whose interests are materially adverse to those of Matthews's present client, Marie, the first two elements are satisfied. Thus, the sole issue before us is whether the judge erred when he concluded that the current matter is the "same" or "substantially related" to the matter in which Matthews represented the past client, Hammond. *RPC* 1.9.

In *Trupos, supra,* the Supreme Court developed the following "workable standard" to be applied when making the determination of whether the prior, and the present, matter are "substantially related." The Court stated:

[F]or purposes of *RPC* 1.9, matters are deemed to be "substantially related" if (1) the lawyer for whom disqualification is sought received confidential information from the former client that can be used against that client in the subsequent representation of parties adverse to the former client, or (2) facts relevant to the prior representation are both relevant and material to the subsequent rep-

Page 5

Not Reported in A.3d, 2011 WL 2566105 (N.J.Super.A.D.)
**(Cite as: 2011 WL 2566105 (N.J.Super.A.D.))**

resentation.

**\*5** [ *Trupos, supra,* 201 *N.J.* at 451–52.]

The burden of persuasion on all elements under *RPC* 1.9 "remains with the moving party, as it bears the burden of proving that **disqualification** is justified." *Id.* at 463 (internal quotation marks and citation omitted). The determination of whether counsel should be **disqualified** is an issue of law that we review de novo. *Ibid.*

Applying the "workable standard" that the Court issued in *Trupos,* we agree with Marie's contention that the judge erred when he **disqualified** Matthews. Despite Hammond's insistence that Matthews received confidential information from him at the time of the 2004 real estate closing on the Little Silver property, the record is devoid of any evidence to support such a contention.

As for the second prong of the *Trupos* test, we begin by observing that the judge's oral decision did not identify any facts that were "relevant to the prior representation" that are also "relevant and material to the subsequent representation." *Id.* at 452. This is not surprising, as there are none. Whether Hammond found out long before the closing that he would be the only party named on the mortgage, as Marie contends, or whether instead he learned of this only in the car on the way to Matthews's office, as he contends, is immaterial. Regardless of which version is true, it has no bearing on the present litigation, in which the Association seeks to recover from Lauren, Marie and Hammond the nearly $1,000,000 that was diverted and embezzled from the Association's coffers. It is also immaterial that Matthews might have been present while Marie and Hammond discussed the subject, as it was not a confidential communication between Hammond and Matthews.

In its discussion of the second *Trupos* prong, the Supreme Court spoke approvingly of the test articulated by the United States District Court for the Southern District of New York: " 'whether facts which were necessary to the first representation are necessary to the present litigation.' " *Id.* at 465 (quoting *U.S. Football League v. Nat'l Football League,* 605 *F.Supp.* 1448, 1459 (S.D.N.Y.1985)). Certainly, the facts concerning when Hammond learned that he would be the only person named on the mortgage for the Little Silver Property are not "necessary to the present litigation." *Id.* at 465 (quoting *U.S. Football League, supra,* 605 *F.Supp.* at 1459). We thus conclude that the judge misapplied the second *Trupos* prong.

We do recognize, however, that "for the purpose of impairing or supporting the credibility of a witness," the opposing party may "introduce extrinsic evidence relevant to the issue of credibility[ .]" *N.J.R.E.* 607. Thus, it is certainly possible that at trial Hammond may seek to undermine Marie's credibility by challenging her assertion that he knew the true situation of the intended mortgage on the Little Silver property in 2004 long before arriving at the closing. To accomplish such an attack on her credibility, it is certainly possible that he might seek to call Matthews as a witness. Even this, which is the ground upon which the judge relied in ordering Matthews's disqualification, does not justify the result the judge reached.

**\*6** *RPC* 3.7 provides that a lawyer shall not act as an advocate at a trial in which the lawyer is likely to be a necessary witness. The Rule does, however, expressly provide an **exception** when the "**disqualification** of the lawyer would work substantial hardship on the client." *RPC* 3.7(a)(3). In reaching a conclusion that Matthews's **disqualification** was required because he might become a witness in the present litigation, the judge ignored the "substantial hardship" **exception**. Had he applied the **exception**, he would have been required to deny the motion for Matthews's **disqualification**. Specifically, in his findings of fact, the judge concluded that the **disqualification** of Matthews would create significant practical difficulties for Marie. While he did not use the *RPC* 3.7(a)(3) "substantial hardship" language, it is evident that he made just

Not Reported in A.3d, 2011 WL 2566105 (N.J.Super.A.D.)
**(Cite as: 2011 WL 2566105 (N.J.Super.A.D.))**

such a finding. The judge stated:

> I feel badly for Mr. Matthews in many respects because the other problem here is that through marriage, he is related to Marie Carty. He has spent a tremendous amount of time representing her in this matter. I think it was over 300 hours at a substantial cost to his law firm.
>
> *And he has advised the [c]ourt that she lives on a very modest income of Social Security and the like, has no real means to hire new counsel if he were disualified*, which creates a whole other issue for her.
>
> [ (Emphasis added).]

Thus, the judge made a finding that it was highly unlikely that Marie would be able to afford counsel and would likely become **pro se** if Matthews were to be **disqualified**. That scenario constitutes "a substantial hardship" that should have caused the judge to deny Hammond's motion to **disqualify** Matthews. *RPC* 3.7(a)(3). Thus, we conclude that the very basis upon which the judge relied in ordering Matthews's **disqualification** constitutes a mistaken application of the applicable law. We therefore reverse the order under review, both because the judge misapplied both prongs of the *Trupos* test, and because the judge ignored the "substantial hardship" **exception** to *RPC* 3.7.

We make an additional observation. Even if the judge had been correct in **disqualifying** Matthews, the judge erred when he **disqualified** Matthews's entire firm from representing Marie. *RPC* 3.7(b) specifically provides that even if a lawyer is **disqualified** from representing a client because he or she is likely to be called as witness at trial, the lawyer's firm may still continue to represent the client. Thus, the **disqualification** of Matthews's law firm was error.

Reversed and remanded.

N.J.Super.A.D.,2011.
Wellington Place Condominium Ass'n v. Carty

Not Reported in A.3d, 2011 WL 2566105 (N.J.Super.A.D.)

END OF DOCUMENT

Not Reported in F.Supp., 1995 WL 1671908 (S.D.Ohio)
**(Cite as: 1995 WL 1671908 (S.D.Ohio))**

**H**
Only the Westlaw citation is currently available.

United States District Court, S.D. Ohio, Western
Division.
BSW DEVELOPMENT GROUP et al., Plaintiffs,
v.
CITY OF DAYTON, et al., Defendants.

No. C–3–93–438.
Sept. 13, 1995.

Dwight Dean Brannon, Brannon & Lowe—3,
Dayton, OH, for BSW Development Group,
plaintiff.

Dwight Dean Brannon, (See above), for William I
Schoenfeld, plaintiff.

Neil Frank Freund, Shawn Michael Blatt, Freund
Freeze & Arnold—3, Dayton, OH, Jane Michele
Lynch, Green & Green, Dayton, OH, for Dayton
City of, defendant.

Neil Frank Freund, Shawn Michael Blatt, Jane
Michele Lynch, (See above), for Board of Zoining
Appeals, defendant.

Neil Frank Freund, Shawn Michael Blatt, Jane
Michele Lynch, (See above), for Landmark Com-
mission, defendant.

Neil Frank Freund, Shawn Michael Blatt, Jane
Michele Lynch, (See above), for Teresa Prosser,
Secretary of Landmarks Commission, defendant.

DECISION AND ENTRY SUSTAINING DE-
FENDANTS' MOTION TO DISQUALIFY COUN-
SEL OF RECORD FOR PLAINTIFFS (DOC. #
42); FURTHER PROCEDURES SUGGESTED
RICE, J.

**\*1** This case is before the Court on the Defend-
ants' Motion to Disqualify Counsel of Record for
Plaintiff BSW Development Corporation ("BSW").

FN1 *See* Doc. # 42. With that motion, Defendants
argue that Dwight D. Brannon ("Brannon") must be
disqualified as counsel for BSW, because Plaintiffs
have identified Brannon as an expert and as a lay
witness. *See* Plaintiffs' Disclosure of Witnesses
(Doc. # 10) (identifying Brannon as a potential lay
and expert witness); Plaintiffs' Notice of Supple-
mental Designation of Witnesses (Doc. # 54)
(identifying Brannon as a potential lay and expert
witness). In support of their motion, the Defendants
rely upon Rules 5–101(B) and 5–102(A) of the
Code of Professional Responsibility.FN2

> FN1. Plaintiffs' Motion for Reconsidera-
> tion (Doc. # 51) is also pending. The Court
> will rule on that motion by separate entry.

> FN2. Herein, this Court relies upon Rules
> 5–101(B) and 5–102(A) of the Ohio Code
> of Professional Responsibility, since the
> Ohio Code governs ethical standards in the
> United States District Court for the South-
> ern District of Ohio. *See* S.D.Ohio General
> Order 81–1 (adopting Model Federal Rules
> of Disciplinary Enforcement, which, in
> Rule IV(B), provide that the Ohio Code of
> Professional Responsibility shall govern
> conduct of attorneys practicing in the
> Southern District of Ohio).

Rule 5–101(B) provides:

A lawyer shall not accept employment in contem-
plated or pending litigation if he knows or it is
obvious that he or a lawyer in his firm ought to
be called as a witness, except that he may under-
take the employment and he or a lawyer in his
firm may testify:

(1) If the testimony will relate solely to an uncon-
tested matter.

(2) If the testimony will relate solely to a matter
of formality and there is no reason to believe that
substantial evidence will be offered in opposition

Not Reported in F.Supp., 1995 WL 1671908 (S.D.Ohio)
**(Cite as: 1995 WL 1671908 (S.D.Ohio))**

(3) If the testimony will relate solely to the nature and value of legal services rendered in the case by the lawyer or his firm to the client.

(4) As to any matter, if refusal would work a substantial hardship on the client because of the distinctive value of the lawyer or his firm as counsel in the particular case.

Rule 5–102(A) provides:
If, after undertaking employment in contemplated or pending litigation, a lawyer learns or it is obvious that he or a lawyer in his firm ought to be called as a witness on behalf of his client, he shall withdraw from the conduct of the trial and his firm, if any, shall not continue representation in the trial, except that he may continue the representation and he or a lawyer in his firm may testify in the circumstances enumerated in DR 5–101(B)(1) through (4).

The Court has not conducted an evidentiary hearing on the Defendants' Motion to Disqualify (Doc. # 42). Indeed, no party requested such a hearing. In *General Mill Supply Co. v. SCA Services, Inc., 697 F.2d 704 (6th Cir.1982),* the Sixth Circuit held that a court need not conduct an evidentiary hearing on a motion to disqualify, if the court does not need to resolve factual disputes in order to rule on that motion. Herein, no factual disputes have been raised by the Defendants' motion. This is not a situation where the parties disagree over whether counsel will be called as a witness; rather, Plaintiffs have designated Brannon as a lay and as an expert witness, in two documents filed with this Court. *See* Docs. # 10 and # 54. Moreover, the Plaintiffs have not argued that one or more of the exceptions contained in Rule 5–101(B), and incorporated into Rule 5–102(A), applies herein and that, therefore, Brannon need not be disqualified. Therefore, an evidentiary hearing was not necessary to resolve the question of whether such an exception applies herein.

\*2 In *International Electronics Corp. v. Flanzer,* 527 F.2d 1288, 1294 (2d Cir.1975), the Second Circuit explained the rationale behind Rules 5–101(B) and 5–102(A):

The ultimate justification for the disqualification rule, in [Professor] Wigmore's view, was that the public might think that the lawyer is distorting the truth for the sake of his client. Another argument for disqualification is that the lawyer-witness will vouch for his own credibility in summing up to the jury—a powerful means of support for his own credibility. The argument that such tactic is to the detriment of his client obviously defeats itself. But the argument that it is unfair to the opponent has some merit. It is difficult, indeed, to cross-examine a witness who is also an adversary counsel concerning matters of fact, and, more particularly, on matters impeaching his credibility, within the bounds of propriety and courtesy owed to professional colleagues.

*See also, S & R, Inc. v. Unlimited Financing, Inc.,* 625 F.Supp. 1033, 1036–37 (S.D.Ohio 1985). Herein, Plaintiffs have indicated that they may call Brannon as not only a lay witness, but also as an expert witness. Testimony by Brannon as a witness will implicate the concerns which the two disciplinary rules are designed to avoid. Indeed, in the present litigation, the problems occasioned by Brannon's testimony would be exacerbated by the fact that he has been named as an expert witness. If Brannon testifies as such a witness, Plaintiffs could have a distinct advantage over the Defendants in the eyes of the jury, since their counsel's excellent qualifications and credentials, honed through years of experience, will be set forth, under oath, as the basis of his expert testimony. A central purpose of Rules 5–101(B) and 5–102(A) is to prevent the prejudice a party may suffer when opposing counsel testifies and is, therefore, able to vouch for his own credibility before the jury in closing argument. The danger of prejudice from vouching is increased herein because Brannon, testifying as a expert witness, will have had the opportunity to impress the

Not Reported in F.Supp., 1995 WL 1671908 (S.D.Ohio)
**(Cite as: 1995 WL 1671908 (S.D.Ohio))**

jury with his background as well as with his excellent qualifications and credentials. This will likely give both his testimony and his final argument to the jury undue weight with that body.

Nevertheless, Plaintiffs argue that Brannon should not be disqualified, because he is a partner of BSW and, as such, he is essentially acting as his own counsel.[FN3] Plaintiffs contend that a lawyer has an absolute right to **represent** himself and that, therefore, **Rules** 5–101(B) and 5–102(A) do not mandate Brannon's disqualification. This Court agrees with the Plaintiffs that **Rules** 5–101(B) and 5–102(A) do not require the disqualification of an **attorney-witness**, who is acting as his own counsel. See e. g., *In re American Cable Publications, Inc.*, 768 F.2d 1194 (10th Cir.1985) (and cases cited therein). See also, 28 U.S .C. § 1654 (parties may **represent** themselves in litigation in courts of the United States). However, this Court cannot agree with the Plaintiffs that Brannon is exempt from the prohibitions contained in **Rules** 5–101(B) and 5–102(A), merely because he is a partner of BSW.

> FN3. Plaintiffs also argue that the Defendants lack standing to challenge any conflict of **interest** which Brannon's participation as their counsel may cause in this litigation. That argument misperceives the basis of Defendants' Motion to Disqualify. The Defendants do not argue that Brannon must be disqualified because of a conflict of **interest**; rather, they argue that he must be disqualified because he has named himself as a witness. Courts, including the Sixth Circuit, have long held that a party may move to disqualify its adversary's counsel, because he will so testify. See e. g., *General Mill Supply Co. v. SCA Services, Inc*., 697 F.2d 704 (6th Cir.1982).

**\*3** A partnership is a unique creature. The Ohio General Assembly has declared that a partnership can sue and be sued in its own name. See Ohio Rev.Code § 2307.24. In the present case, claims

have been brought in the name of the partnership, BSW; Brannon is not named as a plaintiff. In addition, the Ohio Supreme Court has held that:

> A partnership is an aggregate of individuals and does not constitute a separate legal entity. ( R.C. 1775.05[A], construed; *Byers v. Schlupe* [1894], 51 Ohio St. 300, 314, 38 N.E. 117, 121. followed.)

*Arpadi v. First MSP Corp*., 68 Ohio St.3d 453, 628 N.E.2d 1335 (1994) (¶ 1 of the syllabus).[FN4] *See also, Battista v. Lebanon Trotting Ass'n*, 538 F.2d 111, 116 (6th Cir.1976).[FN5] The fact that a partnership, such as BSW, is an aggregate of its partners rather than a separate legal **entity** does not mean that **Rules** 5–101(B) and 5–102(A) do not apply to Brannon. If BSW is nothing more than an aggregate of its partners and, therefore, Brannon is **representing** himself, he is also **representing** his partners. In other words, Brannon is an **attorney** who proposes to testify at trial not only on behalf of himself, but also on behalf of his clients, his partners. Therefore, this Court concludes that **Rules** 5–101(B) and 5–102(A) apply herein even though Brannon is a partner in BSW.[FN6]

> FN4. In *Arpadi,* the Ohio Supreme Court unanimously rejected the argument that a partnership is a distinct legal **entity**, like a corporation, so that an **attorney representing** the partnership primarily owes duties to the partnership. Rather, the *Arpadi* court concluded that the duties which the **attorney** owes to the partnership extend to the partners.

> FN5. In *Battista,* the Sixth Circuit concluded that, since a partnership was nothing more than an aggregate of its partners, a partner could not be held liable for tortiously interfering with a contract entered into by the partnership.

> FN6. In addition, the Plaintiffs bring this action not just as an action for damages

Not Reported in F.Supp., 1995 WL 1671908 (S.D.Ohio)
**(Cite as: 1995 WL 1671908 (S.D.Ohio))**

caused to BSW by the Defendants' allegedly unconstitutional actions; rather, the Plaintiffs also bring this action on behalf of all taxpayers, seeking a declaration that Dayton's ordinances relating to the preservation of historical buildings are unconstitutional. Therefore, Brannon represents more than merely himself and his partners.

Moreover, the cases upon which the Plaintiffs rely fail to convince this Court that it should not apply Rules 5–101(B) and 5–102(A) in the present case. For instance, in *Mentor Lagoons, Inc. v. Rubin,* 31 Ohio St.3d 256, 510 N.E.2d 379 (1987), the Ohio Supreme Court concluded, in ¶ 1 of the syllabus, that Rule 5–102(A) does not that render an attorney incompetent to testify and that a trial court may not, therefore, prevent counsel for one of the parties from so testifying.FN7 That court also held, in ¶ 2 of the syllabus, that when an attorney is called as a witness in a case, the trial court must apply Rule 5–102(A), including the exceptions to disqualification incorporated into that rule, to determine whether counsel must be disqualified (or should be allowed to withdraw). Herein, the Defendants do not seek to prevent Brannon from testifying; rather, they are following the procedure mandated in *Mentor Lagoons* by seeking to have the Court disqualify him in his role as counsel, because he has been named as a potential witness. In many of the other cases cited by the Plaintiffs,FN8 the courts recognized that Rules 5–101(B) and 5–102(A) do not require the disqualification of an **attorney-witness** who is **representing** himself as a party to the litigation. Herein, Brannon is not merely **representing** himself; rather, he seeks to **represent** BSW, a partnership of which he is a partner. Therefore, to the extent that, because he is a partner in BSW, he **represents** himself, he also **represents** his partners.

FN7. In *Mentor Lagoons,* the plaintiff's counsel had himself sworn as a witness. The defendants' counsel then moved, orally, to disqualify him. The trial court, *sua sponte,* prohibited plaintiff's counsel from testifying.

FN8. *See Borman v. Borman,* 278 Mass. 775, 393 N.E.2d 847 (1979); *Presnick v. Esposito,* 8 Conn.App. 364, 513 A.2d 165 (1986); *O'Neil v. Bergan,* 452 A.2d 337 (D.C.App.1982) and *Beckstead v. Desert Roofing Company,* 831 P.2d 130 (Utah App.1992).

The Plaintiffs rely on *Gorovitz v. Planning Bd. of Nantucket,* 394 Mass. 246, 475 N.E.2d 377 (1985). In *Gorovitz,* the Supreme Judicial Court of Massachusetts, in extending the principle that an **attorney-witness representing** himself cannot be disqualified, under Rules 5–101(B) and 5–102(A), to a situation where the **attorney-witness** was **representing** a limited partnership, of which he was the general partner, held that Rules 5–101(B) and 5–102(A) did not require the disqualification of an **attorney-witness** who was also the general partner of a limited partnership on whose behalf the action was brought.FN9 Given the unique facts of the instant case, this Court is unwilling to follow *Gorovitz.* In *Gorovitz,* the **attorney** was going to testify as a fact witness, regarding events which occurred before the Nantucket Planning Board. Herein, Brannon proposes to testify not only as a fact or lay witness, but also as an expert witness. As stated, it would be unfair to the Defendants to require them to oppose counsel who has testified regarding his credentials and his qualifications to give such expert testimony. In addition, the Plaintiffs bring this action not just as an action for damages caused to BSW by the Defendants' allegedly unconstitutional actions; rather, the Plaintiffs also bring this action on behalf of all taxpayers, seeking a declaration that Dayton's ordinances relating to the preservation of historical buildings are unconstitutional. Therefore, Brannon represents more than merely himself and his partners.

FN9. Under Massachusetts law, an action on behalf of a limited partnership must be brought in the name of the general partner.

Not Reported in F.Supp., 1995 WL 1671908 (S.D.Ohio)
**(Cite as: 1995 WL 1671908 (S.D.Ohio))**

394 Mass. at 249, 475 N.E.2d at 380.

**\*4** Based upon the foregoing, the Court sustains the Defendants' Motion to Disqualify Plaintiffs' Counsel (Doc. # 42). This Decision does not prevent Brannon from participating in pre-trial procedures, such as discovery and motion practice. A central purpose of Rules 5–101(B) and 5–102(A) is to prevent the prejudice which could befall one party when opposing counsel is able to vouch for his own credibility before the jury, because he has testified at the trial. The danger of prejudice from vouching will not occur during the pre-trial stage of this litigation. Likewise, there can be no prejudice to the Defendants, at the pre-trial stage, from the jury having heard of the credentials and qualifications of counsel as an expert witness.

In order to minimize any hardship which this Decision may cause to the Plaintiffs (*see* **Rule 5–101[B][4]** ), a member of Brannon's law firm may serve as trial counsel for the Plaintiffs. In addition, Brannon may sit at counsel table, as the **representative** of BSW, and consult with trial counsel during the trial. In sum, the Court herein merely forbids Brannon from both testifying as a lay and/or expert witness (unless such testimony comes within one of the three **exceptions** listed in **Rule** 5–101[B] ) and acting as *trial* counsel for the Plaintiffs.[FN10]

> FN10. Parenthetically, the Court notes that it is difficult to imagine how testimony by Brannon as an *expert* witness could fall within one or more of the enumerated exceptions.

This Court expressly grants the Plaintiffs fourteen days from the entry of this Decision in which to file a motion seeking to have the Court reconsider this Decision to disqualify counsel. If such a motion is filed, the Plaintiffs must support same with an affidavit, convincing the Court either that Brannon will not testify as a witness,[FN11] *or* that, if Brannon will so testify as a lay witness, but only as a lay witness, that his testimony will relate solely to an uncontested matter, to a matter of formality,

there being no reason to believe that substantial evidence will be offered in opposition to his testimony, or to the value and value of legal services rendered in this case by him to the Plaintiffs. *See* Rule 5–101(B) and Rule 5–102(A). In the event that the Plaintiffs choose not to file such a motion, they are hereby given 30 days from the entry of this Decision within which to secure substitute *trial* counsel. In the event that such a motion is filed, the parties may brief same in accordance with the local rules of court. *See* S.D.Ohio L.R. 7.2(a)(2).

> FN11. When a sophisticated client makes an informed choice not to call its attorney as a witness, even though counsel may be a potential witness, courts have held that it is not necessary to disqualify counsel. *See e.g.,* *Banque Arabe et Internationale v. Ameritrust Corp.,* 690 F.Supp. 607 (S.D.Ohio 1988). Therefore, if Plaintiffs decide that Brannon's testimony is not necessary, the basis for disqualifying him will have disappeared.

S.D.Ohio,1995.
BSW Development Group v. City of Dayton
Not Reported in F.Supp., 1995 WL 1671908 (S.D.Ohio)

END OF DOCUMENT

Only the Westlaw citation is currently available. NOT FOR PUBLICATION

United States District Court,
D. New Jersey.

Regina S. BAILEY, Plaintiff,
v.
Joseph GIBBONS, Tanya Wood, David Watkins, Esq., Kelly Burton Rocco, Esq., Pat Priant, Russo Realty, the City of Englewood, an Unknown Police Woman, Thornton White, Englewood Police Officer, Gonzalez, Englewood Police Officer, Barrett, Englewood Lieutenant, and 2 Unknown Englewood Police Officers, Defendants.

Civ. Action No. 09–4119 (KSH).
Sept. 12, 2011.

*OPINION*
KATHARINE S. HAYDEN, District Judge.
**I. Introduction**
**\*1** This case touches on several areas of law and involves numerous players. The central actor is plaintiff Regina Bailey, who sold her home in Englewood, New Jersey as part of the resolution of her divorce. Kelly Burton Rocco served as her attorney in connection with the court action that resulted in the forced sale of the house. The house was listed by Russo Realty, whose agent, Pat Priant, obtained the eventual buyers, Joseph Gibbons and Tanya Wood. Gibbons and Wood were represented by David Watkins during the sale. As explained in more detail below, Bailey remained on the property after the closing to clear her possessions out of the house, and Gibbons subsequently called the police to have her removed. City of Englewood police officers Thornton White and Anthony Gonzalez, as well as Lieutenant Kevin Barrett, responded to the call and briefly detained Bailey before letting her go.

Bailey instituted an action in New Jersey state court on January 13, 2009, asserting various state law causes of action against all of the above-named individuals and entities. Judge Menelaos W. Toskos granted summary judgment to the City of Englewood and its police officers ("the Englewood defendants"), but allowed Bailey to file an amended complaint. She did so on July 17, 2009, this time alleging federal and state constitutional claims against the Englewood defendants and asserting state law claims against the remaining defendants. With the permission of the other defendants, the Englewood defendants removed the case to this Court, asserting federal question jurisdiction under 28 U.S.C. § 1331. [D.E. 1.]

After discovery had been completed, all of the defendants moved for summary judgment [D.E. 77, 78, 79, 80, 95], and Bailey moved for summary judgment against all of the defendants [D.E. 83]. In addition, Rocco, who had unsuccessfully moved before Magistrate Judge Patty Shwartz to disqualify Bailey's counsel, James Marks, and for leave to amend her answer to file a third-party complaint against Marks, appealed Judge Shwartz's decision. [D.E. 94.]

The only federal claims stated in Bailey's amended complaint are those asserted against the Englewood defendants. As discussed below, those claims must be dismissed because the Englewood defendants are entitled to immunity, and the Court declines to exercise supplemental jurisdiction over the remainder of Bailey's claims. *Parker v. NutriSystem, Inc.,* 620 F.3d 274, 276 n. 2 (3d Cir.2010) (citing 28 U.S.C. § 1367(c)(3)). Because the Court opts not to exercise jurisdiction over Bailey's state law claims, this opinion relates only to her federal claims and to Rocco's appeal. Accordingly, the following statement of facts relates only to the police incident. The Court bases its analysis of Rocco's appeal on the statement of facts in Judge Shwartz's opinion [D.E. 92], and will review those findings of fact for clear error. *See Lithuanian Commerce Corp., Ltd. v. Sara Lee Hosiery,* 177 F.R.D. 205, 213 (D.N.J.1997).

## II. Summary of Facts[FN1]

FN1. These facts, and all reasonable inferences that can be drawn therefrom, are viewed in the light most favorable to Bailey. *Knopick v. Connelly,* 639 F.3d 600, 606 (3d Cir.2011).

**\*2** As a result of a contentious divorce, Bailey was court-ordered to sell the home she lived in for 25 years, which was located at 166 Belmont Street in Englewood, New Jersey. (Bailey Dep. 130:2–10.) The closing occurred on December 27, 2008, and pursuant to an escrow agreement the parties executed, Bailey was given from the closing until January 4, 2008, to remove all of her possessions from the property. (Bailey Dep. 19:19–21; Escrow Agreement, attached to Mory Certif. as Ex. I.) The agreement provided that if she failed to do so by that date, the buyers, Gibbons and Wood, would have the right to employ a moving and cleaning company "to effectuate the house being delivered in a broom clean condition." (Escrow Agreement) The agreement also provided that the buyers could deduct from the amount held in escrow the pro-rata monthly interest they were obligated to pay under their mortgage from the closing date until such time as the property could be delivered in broom-clean condition. (*Id.*) These deductions cost Bailey approximately $50 per day.

Bailey did not remove her property from the house by January 4. (Bailey Dep. 30:21–25.) On January 7, Gibbons came to the property, and Bailey called the police "for help." (Bailey Reply Certif. of Facts ¶ 66–68.) Officer Jamie Gillert, who is not a defendant in this action, responded. (Gillert Dep. 8:2–4.) She told Bailey that she needed to be out of the house by the next morning, and she told Gibbons that he would need a court order to have Bailey removed, in light of the fact that at the time he did not have documents proving his ownership of the house.[FN2] (Gillert Dep. 11:8–21; Bailey Dep. 49:1–3; Bailey Reply Certif. of Facts ¶ 72.) Though movers came the next morning, Bailey did not have them remove all of her possessions from the property. (Bailey Dep. 52:23–53:6, 56:5–23.)

FN2. Bailey does not assert any claims based on Gillert's visit to the property.

On January 10, Bailey, who was 64 years old at the time, was admitted to the hospital; she stayed there until January 13 for treatment of diabetes and high blood pressure. (Bailey Reply Certif. of Facts ¶ 85.)

On the morning of January 14, 2008, Bailey went to her former home and discovered a dumpster outside the house, filled with construction debris and some of her possessions. (*Id.* ¶¶ 96–97.) The door to the house was open, and Bailey could see workers inside breaking her dishes. (*Id.*) She began to take some of her possessions from the house and place them on a neighbor's lawn. (*Id.* ¶ 99.) She believed that the Escrow Agreement gave her the right to be on the property and reclaim her possessions. (*Id.* ¶¶ 101–102.)

One of the workers called Gibbons, who in turn called the police, gathered all of the documents he thought he would need to prove his ownership of the property, and then drove to the property to meet the police there, with the intention of having Bailey removed. (Gibbons Dep. 89:18–91:6, 115:5–13.) Police officers Thornton White and Anthony Gonzalez responded in separate vehicles, arriving simultaneously at 9:50 a.m. (White Dep. 9:19–22.) White proceeded to talk to Gibbons, who showed the officer his deed to the property and his driver's license and told the officer that he had bought the house three weeks earlier and that, while Bailey was allowed on the premises for a certain period after the closing, at that time she was trespassing. (Gibbons Dep. 92:16–20, 92:24–93:1; White Dep. 15:4–6, 23:16–19.) For her part, Bailey testified that although she did not see Gibbons show any documentation, it is possible that he did. (Bailey Dep. 100:1–17.) Gonzalez stated in his answers to interrogatories that during most of the officers' visit, Bailey was walking around the property, occasionally carrying some of her personal possessions. (Gonzalez Interrogs. ¶ 7.)

**\*3** After speaking to Gibbons, White attempted to talk to Bailey, but she ignored his questions. (White Dep. 28:16–19, 28:23–25; Gonzalez Dep. 12:24–13:1, 13:6–8.) She also did not show him any documentation, such as a lease agreement, that would establish her right to be on the property, and White unsuccessfully told her she needed to leave the property. (White 65:22–24, 66:4–6; Gonzalez Dep. 9:17–22.) White called Lieutenant Kevin Barrett and asked him to come to the property, hoping a higher-ranking officer could be more effective, but Bailey ignored Barrett, as well. (Barrett Dep. 12:12–23, 32:13–19.) After Barrett arrived, White filled him in on everything that had happened; Barrett subsequently asked Gibbons if he wanted to file a complaint against Bailey, and Gibbons responded that he did. (Gibbons Dep. 119:18–120–5; Barrett Dep. 21:19–22.) Barrett instructed White to arrest Bailey, and White took his handcuffs off of his belt, told Bailey to put her hands behind her back, and took hold of her wrists in order to put the handcuffs on her. (Barrett Dep. 33:2–6, 33:14–18; Gibbons Dep. 121:3–10; Bailey Dep. 135:17–19.) However, when Gibbons realized that filing a complaint meant Bailey would be handcuffed and taken to jail, he immediately told the officers that he did not want her arrested, but merely wanted her removed from the property. (Gibbons Dep. 100:18–22, 101:8–14; Bailey Dep. 105:12–15.) The police then let her go with a warning that she should not return to the property without first calling the police, and they also suggested that she seek legal counsel if she needed it. (Bailey Dep. 109:24–110:4; Barrett Interrogs. ¶ 7.)

Bailey conceded in her deposition that only a few seconds elapsed from the time White removed the handcuffs from his belt to the time he released her. (Bailey Dep. 135:2–136:7.) While she initially testified that her excessive force claims are premised on White's conduct in putting her hands behind her back and grabbing her wrists, she immediately corrected herself and stated that she moved her hands behind her back on her own. (*Id.* 135:2–136:7.) She also testified that White did not squeeze or punch her wrists, did not injure her, and never actually placed the handcuffs on her. (*Id.* 105:5–8, 105:12–15, 135:2–136:7, 154:6–7.) Indeed, she testified that she was never arrested. (*Id.* 116:13–14.) She also confirmed that the police did not take any of her possessions from the house. (*Id.* 130:21–23.) She added that "[m]aybe it was only a couple of seconds, but it was a scary couple of seconds." (*Id.* 109:7–8, 135:2–136:7.)

Ten to fifteen minutes after the first incident, Bailey returned to the property, believing she had left her car keys behind. (Bailey Dep. 110:19–25, 111:1–112:15.) Remembering the police officers' advice, she called the police for assistance. (*Id.* 32:6–9, 109:24–110:4.) This time, White and Officer Johnson responded, and Johnson helped Bailey find her keys, which were hanging from her neck, underneath her sweater. (Bailey Dep. 112:1–15.)

### III. Summary Judgment Standard

**\*4** Summary judgment may be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). A fact is material if, under the applicable law, it could affect the outcome of the suit, and an issue of fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). *Id.* The mere existence of some disputed facts is insufficient to defeat a motion for summary judgment. *Id.* When considering a summary judgment motion, a court must view the facts in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Knopick v. Connelly,* 639 F.3d 600, 606 (3d Cir.2011). However, in opposing a motion for summary judgment, a party cannot rest on the pleadings, but must set forth specific facts demonstrating the existence of a genuine issue of fact. *United States v. 717 S. Woodward St.,* 2 F.3d 529, 533 (3d Cir.1993) (quoting Fed.R.Civ.P. 56(e)). The district court's role is not to evaluate the evidence and decide the truth of the matter, but to determine whether there is a genuine issue for trial. *Anderson,* 477 U.S. at 249.

### IV. Claims Against the City of Englewood

The City of Englewood contends that, under the rule set out in *Monell v. Department of Social Services,* it is immune from suit. *Monell,* the seminal case on municipal liability, held that a municipality can be sued under [42 U.S.C. § 1983](#) only if the official conduct that caused the plaintiff's injury was the result of the municipality's policy or custom. [436 U.S. 658, 690, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978).](#) A policy is defined as a "policy statement, ordinance, regulation, or decision officially adopted and promulgated by" the municipality, *id.,* while a custom is defined as a course of conduct that, while not officially adopted, is so permanent and well settled " 'as to virtually constitute law.' " *[Hansell v. City of Atlantic City,](#)* [152 F.Supp.2d 589, 609 (D.N.J.2001)](#) (quoting *[Andrews v. City of Philadelphia,](#)* [895 F.2d 1469, 1480 (3d Cir.1990)).](#) In addition to establishing the existence of a policy or custom, a plaintiff must establish a causal connection between the policy or custom and the injury suffered. *[Talbert v. Kelly,](#)* [799 F.2d 62, 67 (3d Cir.1986).](#) "[A] single incident of police misbehavior by a single policeman is insufficient as sole support for an inference that a municipal policy or custom caused the incident." *[City of Oklahoma City v. Tuttle,](#)* [471 U.S. 808, 832, 105 S.Ct. 2427, 85 L.Ed.2d 791 (1985).](#)

The City of Englewood argues, in support of its motion for summary judgment, that Bailey "has not identified any policy, practice or custom implemented by a policymaker which existed on the date of [Bailey's] arrest," and that she has failed to establish a causal link between the policy and her injury. (Englewood Defs.' Moving Br. at 31–32.) Bailey responds with a host of counterarguments, none of which are sufficient to forestall a grant of summary judgment to the City of Englewood.

**\*5** First, Bailey contends that the City of Englewood has a policy of inadequately training its officers to deal with landlord/tenant issues. However, she provides no evidence of how the City of Englewood trains its officers, no indication of the specific training it failed to provide, and no suggestion of how providing that training could have reasonably prevented her injury. "A [§ 1983](#) plaintiff pressing a claim of this kind must identify a failure to provide specific training that has a causal nexus with his or her injury and must demonstrate that the failure to provide that specific training can reasonably be said to reflect a deliberate indifference to whether constitutional deprivations of the kind alleged occur." *[Colburn v. Upper Darby Twp.,](#)* [946 F.2d 1017, 1030 (3d Cir.1991).](#) Simply showing that police officers could have been better trained is insufficient, *[id.](#)* [at 1029–30,](#) but that is all Bailey does here. She thus cannot establish a *Monell* claim for failure to train.

Second, Bailey contends that in his police report, White (1) misstated the title of the statute pursuant to which Bailey was arrested, and (2) failed to include any mention of the documents he reviewed at the scene. Her argument regarding the title of the statute—that it was changed when the statute was amended in 2005 and that White should have been aware of the change—is absurd. The substance of the law was not changed in any way relevant to this case, 2005 N.J. Sess. Law Serv. Ch. 100 (West),[FN3] and even if White's error were more than a typo, Bailey cannot base a *Monell* claim on a single policeman's mistake. See *[Tuttle,](#)* [471 U.S. at 832.](#) The second argument is just as flimsy; Bailey contends that "[b]oth Lieutenant Barrett and Chief O'Keefe admit this omission [of the documents White reviewed] was not proper policy." (Opp'n Br. to Englewood Defs. at 37 (quoting Pls.' Expert Report).) This is tantamount to an acknowledgment that whatever errors White made on his police report, they were not made pursuant to a City of Englewood policy or custom and therefore cannot expose the City of Englewood to liability.

[FN3.](#) The amendment added "power generation facility, waste treatment facility, public sewage facility, water treatment facility, public water facility, nuclear electric generating plant [and] any facility which stores, generates or handles any hazardous chemical or chemical compounds" to the list of structures where unlicensed entry constitutes a fourth degree crime, rather than a disorderly persons offense. 2005 N.J. Sess. Law Serv. Ch. 100 (West)

Third, Bailey asserts that because White knew that Gillert had been called to the scene previously, he should have called in to the station to review what had occurred at that prior incident. She suggests that his failure to do so was the result of a department-wide policy not to radio back to the station. Setting

aside whether there is a causal connection between White's failure to call back to the station and Bailey's alleged injury,[FN4] Bailey's assertion that the City of Englewood has a policy of not calling back to the police station, made through her expert witness, is incorrect. What Englewood police Chief Arthur O'Keefe actually stated in his deposition was that the fact that there had been a previous incident at the same location would not necessarily be relevant to an officer on the scene, and that the officer would make the decision whether to gather information about the previous incident "based upon the circumstances and facts in front of him." (O'Keefe Dep. 45:3–15, 46:9–23.) He added that a call back to the station might help provide a frame of reference, but is not imperative. (*Id.* 46:20–23.) Having failed to identify a policy mandating that White not call back to the station, Bailey cannot press a claim against the City of Englewood based on his failure to do so.

FN4. This discussion will be taken up *infra* with regard to the individual officers' motion for summary judgment.

**\*6** Fourth, Bailey asserts that the police department should have conducted an internal affairs investigation into the January 14, 2008, incident, and that its failure to do so gives rise to municipal liability. For support she cites *Monaco v. City of Camden,* 2008 WL 408423 (D.N.J. Feb.13, 2008). There, Judge Simandle denied the city's motion for summary judgment, determining that the evidence demonstrated that the city repeatedly failed to conduct investigations into allegations of excessive force and that all of the investigations that did take place were aimed at shoring up the police department's defenses rather than rooting out police misconduct. *Id.* at \*14. The critical difference between *Monaco* and this case is that in this case, Bailey has not provided any evidence that the City of Englewood has systematically failed to investigate allegations of excessive force—or any other alleged constitutional violation—such that the city can be deemed to be deliberately indifferent to the kind of injury Bailey claims to have suffered. *See Natale v. Camden Cnty. Corr. Facility,* 318 F.3d 575, 584 (3d Cir.2003) ("[A] policy or custom may also exist where the policymaker has failed to act affirmatively at all, though the need to take some action to control the agents of the government is so obvious, and the inadequacy of existing practice so likely to result in the violation of constitutional rights, that the policymaker can reasonably be said to have been deliberately indifferent to the need." (internal quotation marks omitted)).

In sum, Bailey has not offered any facts sufficient to hold the City of Englewood liable for the actions of its individual officers. The City of Englewood is therefore entitled to summary judgment on all of the claims against it.

### V. Claims Against the Individual Police Officers

The individual police officers assert that they are entitled to qualified immunity, and that Bailey's § 1983 claims against them should therefore be dismissed.

### A. Qualified Immunity

Section 1983 provides a cause of action to any person who has been deprived of their federal rights by a person acting under color of state law. However, "[w]hen an officer's actions give rise to a § 1983 claim, the privilege of qualified immunity, in certain circumstances, can serve as a shield from suit." *Wright v. City of Philadelphia,* 409 F.3d 595, 599 (3d Cir.2005) "Qualified immunity is a complete immunity from suit ...." *Giles v. Kearney,* 571 F.3d 318, 325 (3d Cir.2009). Under this doctrine, "[g]overnment officials performing discretionary functions are immune 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.' " *Lamont v. New Jersey,* 637 F.3d 177, 182 (3d Cir.2011) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)). The appropriate inquiry is two-pronged and asks (1) whether the official's conduct violated a constitutional right, and (2) whether that right was clearly established such that "a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987); *Lamont,* 637 F.3d at 182. Because police officers in the field must make "split-second judgments—in circumstances that are

tense, uncertain, and rapidly evolving," *Saucier v. Katz,* 533 U.S. 194, 205, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001), *overruled on other grounds by Pearson v. Callahan,* 555 U.S. 223, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009), they are entitled to some leeway for the decisions they make. *Gilles v. Davis,* 427 F.3d 197, 207 (3d Cir.2005). Thus, "[t]he reasonableness of the officer's belief should be judged from [an] on-scene perspective, not with the perfect vision of hindsight." *Id.* In short, qualified immunity excuses an officer's reasonable mistake as to what the law requires. *Saucier,* 533 U.S. at 206. " 'If officers of reasonable competence could disagree on th[e] issue, immunity should be recognized.' " *Giles,* 571 F .3d 325 (quoting *Malley v. Briggs,* 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986)).

**B. False Arrest and False Imprisonment**

**\*7** The Fourth Amendment states that the people are entitled "to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, ... and no Warrants shall issue, but upon probable cause." U.S. Const. amend. IV. "An arrest by a law enforcement officer without a warrant 'is reasonable under the Fourth Amendment where there is probable cause to believe that a criminal offense has been or is being committed.' " *Wright,* 409 F.3d at 601 (quoting *Devenpeck v. Alford,* 543 U.S. 146, 125 S.Ct. 588, 160 L.Ed.2d 537 (2004)). The evidentiary standard for establishing probable cause is much less stringent than that for obtaining a conviction. *Id.* Indeed, the conception of probable cause has long been recognized as practical and nontechnical, and it is intended to balance the right of the people from unreasonable intrusions with the need of law enforcement officers to perform their duties. *Brinegar v. United States,* 338 U.S. 160, 176, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949). "A 'common sense approach [must be taken] to the issue of probable cause' and a determination as to its existence must be based on 'the totality of the circumstances.' " *Paff v. Kaltenbach,* 204 F.3d 425, 436 (3d Cir.2000) (quoting *Sharrar v. Felsing,* 128 F.3d 810, 818 (3d Cir.1997)). Probable cause to arrest exists if "at the moment the arrest was made ... the facts and circumstances within [the officers'] knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the [arrestee] had committed or was committing an offense." *Beck v. Ohio,* 379 U.S. 89, 91, 85 S.Ct. 223, 13 L.Ed.2d 142 (1964). "In other words, the constitutional validity of the arrest does not depend on whether the suspect actually committed any crime." *Wright,* 409 F.3d at 602 (citing *Johnson v. Campbell,* 332 F.3d 199, 211 (3d Cir.2003)).

The *Wright* case is a helpful guide. There, the plaintiff, Kimberly Wright, was a woman who had been sexually assaulted in a home in Philadelphia. 409 F.3d at 597. After her attackers forced her out of the house, she returned and broke in to recover her personal belongings and take other items that she believed could be used to identify her attackers. *Id.* She later reported the assault to the police, and the owner of the house—who was the sister of one of the attackers—reported the break-in. *Id.* A different police officer investigated each alleged crime. *Id.* Wright told the officer investigating the assault that she had broken into the house to recover items that would prove she had been there; she gave those items to the police, and the police later returned the items to the owner of the house. *Id.* During the investigation into the break-in, the investigating officer learned that the owner's brother had brought a woman to the house. *Id.* The officer found a broken pane of glass and a piece of paper with Wright's name inside the house, and during an interview, the owner's brother acknowledged that he had brought Wright to the house but denied that he had had sex with her. *Id.* At some point, the officers learned of each other's investigations. *Id.* at 598. Subsequently, the officer investigating the assault determined there was insufficient foundation to proceed, but before that investigation closed, the other officer obtained an affidavit of probable cause to arrest Wright for burglary. *Id.* Wright was arrested without a warrant and charged with burglary, theft, and criminal trespass, but all of the charges were later dropped. *Id.*

**\*8** The Third Circuit held that the police were entitled to qualified immunity because they had probable cause to arrest Wright for criminal trespass, reversing the decision of the District Court. *Id.* at 603–04. The Third Circuit started its analysis with Pennsylvania's criminal trespass statute, noting that "probable cause exists for an arrest for criminal trespass when the facts and the circumstances are sufficient for a prudent person to believe that the suspect: (1) entered or broke into a building or occupied structure, (2)

knowing that she or he had no license or privilege to do so." *Id.* at 603 (citing 18 Pa. Cons.Stat. Ann. § 3503(a) (1)). Assuming, as it was required to do, that Wright mistakenly believed that she was entitled to break in to the house to retrieve her belongings and physical evidence, the Court nevertheless stated that it was "concerned here only with the question of probable cause, not Wright's guilt or innocence." *Id.* Thus, the question was whether the facts and circumstances presented to the officers justified a reasonable belief on the officers' part that Wright had committed a trespass. *Id.* The Court answered in the affirmative, reasoning that the officers did not believe Wright's explanation for the break-in and that, because the probable cause inquiry looks to the totality of the circumstances, they were not required either to correctly resolve conflicting evidence or to make an accurate credibility determination. *Id.* In addition, Wright admitted to entering the house, a neighbor identified her, and her name was found on a piece of paper inside the house. *Id.* Thus, the Court held that based on the information that was available to the officers at the time, any mistake they made was reasonable. *Id* .

Another Third Circuit case, *Feldman v. Community College of Allegheny,* is also instructive. *See* 85 F. App'x 821 (3d Cir.2004). In that case, the plaintiff was forcibly removed from a campus computer lab by Pittsburgh police officers and arrested for trespass; he had previously had a dispute with the lab instructor over his contractual right to use the lab. *Id.* at 824. The Third Circuit affirmed the District Court's grant of summary judgment in favor of the arresting officers on the plaintiff's false arrest claim. *Id.* at 825. It noted that a college security guard had informed the officers that he had told the plaintiff to leave and the plaintiff refused to comply, and it found that that information was enough to establish probable cause to arrest for defiant trespass. *Id.* Furthermore, the Court rejected the plaintiff's contention that the officers were under a duty to investigate his claim of right to use the computer lab, reasoning that "an officer is not required to 'undertake an exhaustive investigation in order to validate the probable cause that, in his mind, already exists.' " *Id.* (quoting *Merkle v. Upper Dublin Sch. Dist.,* 211 F.3d 782, 790 n. 8 (E.D.Pa.1999)); *see also Gramenos v. Jewel Cos.,* 797 F.2d 432, 439 (7th Cir.1986). The Third Circuit approvingly quoted the District Court's conclusion: "[T]here is no question that the police officers were not required or permitted to conduct a trial of the matter on the spot to determine whose interpretation of [the College's] policies was correct, and that there was ample probable cause to arrest this defiant trespasser who refused to obey repeated requests by the owner's agents to leave." *Feldman,* 85 F. App'x at 826.

**\*9** Turning to the case at hand, the Court concludes that White, Gonzalez, and Barrett had reasonable grounds to believe Bailey had committed a trespass. Thus, they had probable cause to arrest Bailey, there was no constitutional violation, and the officers are entitled to qualified immunity.

Bailey was arrested [FN5] for "unlicensed entry of structures," which is a species of criminal trespass. N.J.S.A. § 2C:18–3(a); *State v. Braxton,* 330 N.J.Super. 561, 565 n. 1, 750 A.2d 185 (App.Div.2000). The statute provides that "[a] person commits an offense if, knowing that he is not licensed or privileged to do so, he enters or surreptitiously remains in any research facility, structure, or separately secured or occupied portion thereof." N.J.S.A. § 2C:18–3(a). It is an affirmative defense if "[t]he actor reasonably believed that the owner of the structure, or other person empowered to license access thereto, would have licensed him to enter or remain." N.J.S.A. § 2C:18–3(d). The elements of the crime are thus nearly identical to Pennsylvania's criminal trespass statute: (1) entering or remaining in a structure (2) with knowledge that such entry is not licensed. The Englewood police officers therefore are entitled to qualified immunity if "the facts and the circumstances are sufficient for a prudent person to believe that [Bailey]: (1) entered or broke into a building or occupied structure, (2) knowing that she ... had no license or privilege to do so." *Wright,* 409 F.3d at 603.

FN5. The Englewood defendants contend that Bailey was never actually arrested because she was only stopped for a matter of seconds, she was never handcuffed, and she was never processed. In addition, Bailey testified that she was never arrested. "To constitute an arrest, however—the quintessential 'seizure of the person' under our Fourth Amendment jurisprudence—the mere grasping or application of physical

force with lawful authority, whether or not it succeeded in subduing the arrestee, [is] sufficient." *California v. Hodari D.,* 499 U.S. 621, 624, 111 S.Ct. 1547, 113 L.Ed.2d 690 (1991). White took hold of Bailey's wrists with lawful authority; therefore, Bailey was arrested.

The record, viewed in the light most favorable to Bailey, shows that after White and Gonzalez arrived at the scene, White spoke to Gibbons, who told White that he was the owner of the property and that Bailey was trespassing. Gibbons then showed White his deed to the property, and White thereafter attempted to speak to Bailey to determine whether she had any documentation establishing her right to be there. Bailey did not provide any documentation and did not speak to the officers. When Barrett arrived, White informed him of the pertinent facts, and after asking Gibbons whether he wanted to file a complaint, Barrett instructed White to arrest Bailey. The information available to the officers at the time-Gibbons's statements, the deed, and Bailey's failure to demonstrate that she was allowed on the property-is sufficient to establish that they had reasonable grounds to believe Bailey's entry into the house was unlicensed and that she knew this to be the case. Therefore, the officers had probable cause to arrest her.

Bailey prevents several arguments in support of her view that no probable cause existed, none of which are availing. Her primary probable cause argument proceeds from the contention that she in fact had a right to be on the property on January 14, 2008, because the Escrow Agreement purportedly gave her that right, so long as she paid $50.94 for each day she occupied the property after the closing date. Ergo, the police could not possibly have had probable cause to arrest her for trespass. This line of reasoning confuses the issue. The question is not whether Bailey was actually guilty or innocent; it is whether the officers, given the facts and circumstances presented to them, reasonably believed they had probable cause to arrest Bailey. *Wright,* 409 F.3d at 603. In this connection, whether the Escrow Agreement provided Bailey the right to remain on the property as of January 14 is irrelevant. It is undisputed that the officers never saw the Escrow Agreement. While White knew at the time of the arrest that Bailey had been allowed to remain on the property for some period after the closing date, he was not aware of when that period was to end and was not aware of any formal agreement to that effect. Probable cause is a "totality of the circumstances" inquiry, and taken together with the remainder of the available information, White's knowledge that Bailey had been allowed to stay on the property at some point does not defeat the conclusion that the officers reasonably believed they had probable cause to arrest her.

**\*10** Bailey also contends that because White knew that Gillert had previously been at the scene (White Dep. 11:1), he had a duty to call back to the police station and investigate what had transpired during the prior incident. Instead of investigating, Bailey argues, the officers simply took Gibbons at his word that he owned the house and that Bailey was trespassing. Furthermore, she asserts that Barrett's investigation was inadequate because he did not speak to either of the parties, but acted only on the information White provided to him. Her contentions are unfounded in law. As the Third Circuit stated in *Feldman,* an officer on the scene need not undertake an exhaustive investigation and may not conduct a trial of the matter at the scene. 85 F. App'x at 825–26. Gibbons's statements, the deed, and Bailey's failure to explain her presence were sufficient to establish probable cause, and neither White nor Barrett was obligated to delve further by investigating Gillert's prior response.

In a related argument, Bailey asserts that Gibbons never actually showed the police his deed to the property. This argument has five prongs: (1) Gibbons testified that he did not show the deed to White during the officer's first visit to the property; (2) Gibbons testified that he only showed the deed to the police at the police station; (3) the police report made no mention of the deed; (4) Bailey did not see Gibbons show the officers the deed; and (5) Gibbons only had one copy of the deed, and that copy was at the County Clerk's office on January 14, 2008, awaiting recordation.

Gibbons's confusion as to the correct sequence of events notwithstanding, [FN6] the record shows that he did in fact show the police the deed at some point before Bailey was arrested. In fact, Gibbons testified that he showed the police officers the deed and his driver's license during their first visit to the property.

(Gibbons Dep. 92:16–20, 111:5–13, 114:19–115:10.) The testimony that Bailey purports to be an admission that Gibbons did not show the deed during the first visit is not what Bailey claims it is. Gibbons's testimony only reflects that White informed him that Bailey had said Gibbons owned the house. (Bailey Moving Br. at 47–48 (recounting Gibbons's deposition testimony).) Nowhere did Gibbons state that he did not show White the deed. Bailey's assertion that Gibbons testified that he only showed the deed at the police station is also inaccurate, and it is immaterial, as well. Gibbons actually testified that he showed the police officers the deed both at the property and at the police station. (Gibbons Dep. 114:19–116:7.) In any event, Bailey's contention that Gibbons only showed the deed at the police station merely serves to prove that Gibbons showed the police the deed at some point before her arrest. Furthermore, while Bailey is entitled to all reasonable inferences at the summary judgment stage, White's failure to mention the deed in the police report does not support an inference that he lied about seeing the deed; Gibbons and Barrett both testified that White reviewed the deed, and Barrett stated that he saw the deed, as well. In a similar vein, Bailey's testimony that she did not personally see Gibbons show White the deed cannot support an inference that it did not happen, especially where the remainder of the testimony is to the contrary and there is evidence that Bailey was gathering her belongings while Gibbons was talking to White. Finally, Bailey's assertion that Gibbons testified that he only had one copy of the deed—and that that copy was at the County Clerk's office on January 14, 2008—is not supported in the record, but rather is based on a misinterpretation of Gibbons's testimony. Bailey points to a pair of discussions Gibbons had with her counsel about the deed during his deposition. The first is as follows:

FN6. The first and second prongs of Bailey's argument relate to a phantom factual dispute she proffers in an effort to defeat summary judgment—her position is that a dispute exists as to how many times the police actually came to the property, when they came to the property, and the correct sequence of events.

According to her submissions, she and Gibbons agree that the police visited the property twice, that they left without arresting her after the first visit, and that they arrested her when they returned. This view is not supported in the record. In fact, Bailey testified that the police arrested her during their first visit and that during the second visit, one of the officers helped her find her keys and then left. (Bailey Dep. 98:2–3, 110:19–25, 111:1–112:15.) Her testimony largely comports with the version of events offered by the officers. They stated that they first went to the property at 9:50 a.m., and that during that incident, they arrested Bailey. Subsequently, at 11:06 a.m., they received a call that Bailey was back at the property, and White and Johnson returned, only to find that no one was there. (White Interrogs. ¶ 7.)

In his testimony, meanwhile, Gibbons contradicted himself and appeared to mix up the order in which the events of January 14, 2008, occurred. Under questioning by Bailey's attorney, he first testified that when one of the workers at the property called to tell him Bailey was there, he called the police, took the deed out of his file, and then went to the property to meet the police there. When he got there, he showed the officers his deed and his driver's license, and told them that he owned the house and that Bailey was trespassing. The officers then asked him if he wanted to file a complaint against Bailey, he said he did, and the officers began to arrest her before he told them to stop. (Gibbons Dep. 90:16–102–15.) However, under questioning by the Englewood defendants' attorney, he later testified that the first call concluded when Bailey grabbed some of her things, got in her car and left. Gibbons then went home and received another call that Bailey was at the house. He subsequently went to the Englewood police station, showed the sergeant his deed and told the sergeant he wanted to file a complaint. Thereafter, he met the officers at the property, where Bailey was looking for her keys; after Bailey and one of the officers walked through the house looking for the keys, they came outside and the officers began to arrest Bailey before Gibbons told them to stop. (*Id.* 110:2–122:5.)

Gibbons's recollection of the sequence of events clearly cannot be accurate. He testified that the officers on the scene when Bailey was arrested were one black officer, one Latino officer, and one white officer of a higher rank than the others. (*Id.* 117:20–24.) This testimony fits a description of White, Gonzalez, and Barrett, and fits Bailey's description of the officers who were on the scene for the first call, when she

testified that she was arrested. (Bailey Dep. 98:18–23.) Bailey also testified that two black officers re-
ported to the second call, including the black officer from the first call; she identified Johnson as the oth-
er black officer, the one who helped her find her keys. (*Id.* 111:8–111:17, 392:16–19, 395:14–15.) The
dispatch reports in the record confirm that White, Gonzalez, and Barrett responded to the first call at 9:50
a.m. and White and Johnson responded to the second call at 11:28 a.m. (Dispatch Reports, attached to
Bailey Mot. as Exs. 2, 5.) Therefore, despite Gibbons's confusion, the record shows that Bailey was ar-
rested during the officers' first trip to the property.

**\*11** Q: There was one deed. Did you have more than one version of the deed?

A: Whatever I received in the closing documents is what I have.

Q: And if you received anything subsequent—I'm sorry. Do you have a folder of your legal documents?

A: Yes.

Q: Have you put everything from this closing in the folder to the best of your knowledge?

A: Yes.

Q: Have you discarded anything from that folder since the time of closing?

A: No.

Q: So what you delivered [during discovery] was a complete—all of the documents that you have, cor-
rect?

A: Yes.

(Gibbons Dep. 43:20–44:13.)

Bailey's counsel returned to this line of questioning later on.

Q: Is that the deed that you showed to the police officers, a copy of it?

A: I believe it is.

Q: And you only had one copy of the deed, correct, in your possession, the original, the only—

A: I already answered the question.

(*Id.* 93:8–14.) Nowhere in either of these exchanges did Gibbons say he only had one copy of the deed.
Rather, he testified that he had a folder into which he put all of the documents from the closing, and he
turned all of those documents over to Bailey during discovery. He also testified that he showed the police
officers a copy of the deed. It was Bailey's counsel who said there was only one copy of the deed, not
Gibbons. To the contrary, Gibbons repeatedly confirmed that he had a copy of the deed with him on Jan-
uary 14, 2008. To wit, he testified that after he got the first call from the workers at the property, he went
into his file and took the deed out. (*Id.* 94:21–23.) In addition, he stated that he was sure he had a deed in
his possession and that before he went to the property on January 14, 2008, he gathered documents, in-
cluding the deed, that would prove his ownership of the property. (*Id.* 111:5–13.)

Even if the Court assumes that Gibbons never showed the deed to the police officers, Bailey's assertion that they were not entitled to take Gibbons's word for it is incorrect. To the contrary, "[w]hen an officer has received his information from some person—normally the putative victim or an eye witness—who it seems reasonable to believe is telling the truth, he has probable cause." *Gramenos,* 797 F.2d at 439; *see also Merkle,* 211 F.3d at 790. Even when taken in the light most favorable to Bailey, the evidence shows that Gibbons told the police officers that he owned the property and Bailey was trespassing, and Bailey failed to respond to the officers' questions or provide documentation entitling her to be there. Therefore, the police officers had reasonable grounds to believe that Bailey was not licensed to be on the property and that she knew she was not licensed to be there. As such, they had probable cause to arrest Bailey, and because no constitutional violation occurred, they are entitled to qualified immunity. In addition, because "an arrest based on probable cause [can]not become the source of a claim for false imprisonment," *Groman v. Twp. of Manalapan,* 47 F.3d 628, 636 (1995) (citing *Baker v. McCollan,* 443 U.S. 137, 143–44, 99 S.Ct. 2689, 61 L.Ed.2d 433 (1979)), the officers are entitled to summary judgment on Bailey's false imprisonment claim, as well.

## C. Excessive Force

**\*12** A § 1983 claim of excessive force has its roots in the Fourth Amendment as well, specifically that Amendment's bar against unreasonable seizures. *Lamont,* 637 F.3d at 182. The task for a plaintiff is to demonstrate that a seizure occurred and that, under the circumstances, the seizure was unreasonable. *Id.* at 183 (citing *Graham v. Connor,* 490 U.S. 386, 395–96, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989); *Brower v. County of Inyo,* 489 U.S. 593, 599, 109 S.Ct. 1378, 103 L.Ed.2d 628, (1989)). "The test of reasonableness under the Fourth Amendment is whether under the totality of the circumstances, 'the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivations.' " *Kopec v. Tate,* 361 F.3d 772, 776 (3d Cir.2004) (quoting *Graham v. Connor,* 490 U.S. 386, 397, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989)). Again, the conduct must be viewed from the vantage point of a reasonable officer on the scene. *Lamont,* 637 F.3d at 183. "Monday morning quarterbacking is not allowed." *Id.* Factors to be taken into account include "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham,* 490 U.S. at 296. A lack of physical injury does not conclusively establish that the force used was reasonable, but because the Constitution protects only against the egregious use of force, physical injury is a relevant consideration. *Kopec,* 361 F.3d at 776.

The force used to arrest Bailey was minimal. Bailey testified that White took hold of her wrists and that she did not suffer any injury. He did not squeeze or punch her wrists, he never handcuffed her, and the incident lasted only a few seconds. No reasonable officer would have believed White's actions to constitute an excessive use of force, and no reasonable juror would have either. The officers are therefore entitled to qualified immunity on Bailey's excessive force claim.

## D. Procedural Due Process

Bailey claims that the police officers deprived her of procedural due process by preventing her from using and occupying the house, which she claims was her right under the Escrow Agreement, and by preventing her from claiming her possessions and allowing Gibbons to destroy them. The Fourteenth Amendment guarantee of procedural due process does not protect against deprivations of property in and of themselves; rather, it protects against such deprivations that occur "without due process of law." *Parratt v. Taylor,* 451 U.S. 527, 537, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981), *overruled on other grounds by Daniels v. Williams,* 474 U.S. 327, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986) (quoting *Baker v. McCollan,* 443 U.S. 137, 145, 99 S.Ct. 2689, 61 L.Ed.2d 433 (1979)). In *Parratt,* the Supreme Court held that in situations where it is impractical or impossible for a state to provide predeprivation process, such as when a police officer undertakes a random, unauthorized act, a cause of action for deprivation of property without due process of law will not lie under § 1983 if the state provides an adequate postdeprivation remedy. *Id.* at 538, 541. In this case, the alleged deprivation did not occur pursuant to some established state pro-

cedure, but was the product of a purported failure by the police officers to follow the appropriate proce-
dure. *See supra* Part IV. The State of New Jersey provides causes of action for trespass and conversion,
N.J.S.A. §§ 2A:14–1, 59:3–1, which Bailey could have employed. Indeed, she appears to recognize these
available remedies, as she states in her briefs that the police officers either converted her property or
were complicit in Gibbons's conversion. (*See* Opp'n Br. to Englewood Defs. at 29–31.) While Judge Tos-
kos dismissed Bailey's tort claims against the police officers and the City of Englewood in state court for
failure to file a notice claim as required by the New Jersey Tort Claims Act (June 12, 2009, Order, at-
tached to Mory Certif. as Ex. C), Bailey nevertheless cannot recover on her procedural due process claim
because the option to sue in tort was available to her. *See Revell v. Port Auth. of N.Y. & N.J.,* 598 F.3d
128, 139 (3d Cir.2010), *aff'g* 2009 WL 901855 (D.N.J. Mar.31, 2009) (Hayden, J.). Therefore, the indi-
vidual officers are entitled to summary judgment on Bailey's procedural due process claim.

**E. Substantive Due Process**
**\*13** In addition to asserting a violation of her procedural due process rights, Bailey also asserts that the
officers' deprivation of her property violated her substantive due process rights under the Fourteenth
Amendment. [FN7] To establish a substantive due process violation predicated on a deprivation of property,
a plaintiff "must show that the actions of the officials 'shock[ ] the conscience.' " *Papaia v. City of Un-
ion City,* 238 F. App'x 848, 850–51 (3d Cir.2007) (quoting *County of Sacramento v. Lewis,* 523 U.S. 833,
846, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998)) (alteration in original). Only "the most egregious gov-
ernment conduct" violates substantive due process. *Lewis,* 523 U.S. at 846. On the record before the
Court, no reasonable jury could find that the officers' conduct violated Bailey's substantive due process
rights. As discussed above, the officers viewed Gibbons' deed and had no knowledge of the Escrow
Agreement that supposedly gave Bailey the right to stay on the property. In addition, Bailey testified that
none of the police officers took any of her personal possessions, and in fact, she was allowed to take
many of her belongings with her when she was told to leave the property. (Bailey Dep. 130:21–23,
143:11–13, 144:8–19; Gibbons Dep. 114:4–12; Gonzalez Dep. 18:7–13, 23:5–8, 32:10–12; Barrett Dep.
27:1–6; White Interrogs. ¶ 7; Bailey Reply Certif. of Facts ¶ 114.) This kind of conduct can hardly be
said to be improper, let alone conscience-shocking. The Englewood defendants are therefore entitled to
summary judgment on Bailey's substantive due process claim.

FN7. To the extent Bailey seeks to assert Fourteenth Amendment substantive due process claims based
on her arrest and the officers' use of force, they are subsumed under her Fourth Amendment claims.
"Where a particular Amendment 'provides an explicit textual source of constitutional protection' against
a particular sort of government behavior, 'that Amendment, not the more generalized notion of substan-
tive due process, must be the guide for analyzing these claims.' " *Albright v. Oliver,* 510 U.S. 266, 273,
114 S.Ct. 807, 127 L.Ed.2d 114(1994) (quoting *Graham v. Connor,* 490 U.S. 386, 395, 109 S.Ct. 1865,
104 L.Ed.2d 443 (1989)). The Fourth Amendment provides for protection against false arrest and impris-
onment, *Wright,* 409 F.3d at 601, and excessive force, *Graham,* 490 U.S. at 395.

**F. Conspiracy**
Bailey alleges that the Englewood defendants conspired to deprive her of her constitutional rights and
carried out the conspiracy by filing a false police report. This claim invokes 42 U.S.C. § 1985(3), which
provides that

If two or more persons in any State or Territory conspire ... for the purpose of depriving, either directly or
indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and
immunities under the laws; ... in any case of conspiracy set forth in this section, if one or more persons
engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby
another is injured in his person or property, or deprived of having and exercising any right or privilege of
a citizen of the United States, the party so injured or deprived may have an action for the recovery of
damages occasioned by such injury or deprivation, against any one or more of the conspirators.

The elements of a cause of action under § 1985 are "(1) a conspiracy; (2) motivated by a racial or class based discriminatory animus designed to deprive, directly or indirectly, any person or class of persons to the equal protection of the laws; (3) an act in furtherance of the conspiracy; and (4) an injury to person or property or the deprivation of any right or privilege of a citizen of the United States." *Lake v. Arnold,* 112 F.3d 682, 685 (3d Cir.1997). Notably, an action under § 1985 cannot proceed absent evidence of race- or class-based animus, *id.,* and, furthermore, "[b]ecause § 1985 does not itself create any substantive rights but acts as a 'vehicle to vindicate [other] federal rights and privileges,' [a plaintiff] first must establish a violation of [her] constitutional rights in order to have a successful § 1985 claim." *Papaiya,* 238 F. App'x at 851 (quoting *Brown v. Philip Morris, Inc.,* 250 F.3d 789, 805 (3d Cir.2001)). On this latter point, an official who is immune from suit under § 1983 is also immune from suit under § 1985(3). *Downey v. Coal. Against Rape and Abuse, Inc .,* 143 F.Supp.2d 423, 453 (D.N.J.2001).

**\*14** Bailey's § 1985(3) conspiracy claim must fail for two reasons. First, she has not alleged any race- or class-based animus, and has provided no evidence of it. Her sole argument on this point is the incorrect assertion that "the Constitutional Tort claimed does not require the reliance on the Class status." (Opp'n Br. to Englewood Defs. at 33.) Second, as discussed above, the Englewood defendants are entitled to summary judgment on Bailey's § 1983 claims. Therefore, her § 1985(3) claim must fall, as well.

## VI. Rocco's Appeal of the Magistrate Judge's Order

Defendant Rocco appeals Judge Shwartz's order [D.E. 76] denying her motions (1) to disqualify plaintiff's counsel and (2) for leave to amend her answer to assert a third-party complaint against plaintiff's counsel.

Pursuant to L. Civ. R. 72.1(c)(1)(A), "any party may appeal from a Magistrate Judge's determination of a non-dispositive matter," including a motion to disqualify counsel. *Tare v. Bank of America,* 2009 WL 90326, at \*1 (D.N.J. Jan.13, 2009) (Linares, J.). On appeal, a district court judge examines whether the magistrate judge's decision is "clearly erroneous or contrary to law." L. Civ. R. 72.1(c)(1)(A); *Marks v. Struble,* 347 F.Supp.2d 136, 149 (D.N.J.2004) (Cooper, J.). The party who filed the appeal bears the burden of establishing that the magistrate judge's decision is clearly erroneous or contrary to law. *Travelers Indem. Co. v. Dammann & Co.,* 592 F.Supp.2d 752, 758–59 (D.N.J.2008) (Debevoise, J.). " 'A finding is clearly erroneous when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.' " *Bobian v. CSA Czech Airlines,* 222 F.Supp.2d 598, 601 (D.N.J.2002) (Debevoise, J.) (quoting *Dome Petroleum Ltd. v. Emp'rs Mut. Liab. Ins. Co.,* 131 F.R.D. 63, 65 (D.N.J.1990)). "A ruling is contrary to law if the magistrate judge has misinterpreted or misapplied applicable law," *id.* (citing *Gunter v. Ridgewood Energy Corp.,* 32 F.Supp.2d 162, 164 (D.N.J.1998)), and "a magistrate's legal conclusions on a non-dispositive motion will be reviewed de novo." *Doe v. Hartford Life & Accident Ins. Co.,* 237 F.R.D. 545, 548 (D.N.J.2006) (Linares, J.).

Rocco moved below to disqualify plaintiffs counsel, James Marks, because, she claims, he is likely to be a necessary witness at trial. Her assertion invokes New Jersey Rule of Professional Conduct 3.7, which provides that

(a) A lawyer shall not act as advocate at a trial in which the lawyer is likely to be a necessary witness unless:

(1) the testimony relates to an uncontested issue;

(2) the testimony relates to the nature and value of legal services rendered in the case; or

(3) disqualification of the lawyer would work substantial hardship on the client.

"The Rule is designed to prevent a situation in which at trial a lawyer acts as an attorney and as a witness, creating the danger that the fact finder (particularly if it is a jury) may confuse what is testimony and what is argument, and otherwise creating an unseemly appearance at trial." *Prods., LLC v. Lacy,* 220 *Main Events* F.Supp.2d 353, 357 (D.N.J.2002). Only where an attorney has "crucial information in his possession which may be divulged" will he be deemed "likely to be a necessary witness." *Garza v. McKelvey,* 1991 WL 3302, *3 (D.N.J. Jan.2, 1991).

**\*15** Motions to disqualify counsel are disfavored because they are viewed as drastic measures. *Carlyle Towers Condo. Ass'n, Inc., v. Crossland Savings FSB,* 944 F.Supp. 341, 345 (D.N.J.1996). "**The party seeking disqualification bears the burden of showing that continued representation by the lawyer would violate the disciplinary rules.**" *Oswell v. Morgan Stanley Dean Witter & Co.,* 2007 WL 2446529, at * 3 ( D.N.J. Aug. 22, 2007). Furthermore, the movant "**must do more than simply make representations that a lawyer is a necessary witness for the attorney to be disqualified.**" *Id.* "**Indeed, the party seeking to disqualify must put forth evidence that establishes the likelihood that the attorney will be a necessary witness at trial and if it is unclear from the record as to whether or not the attorney's testimony is necessary, the motion should be denied.**" *Id.* If the information possessed by the attorney can be introduced through other documents or witnesses, the attorney is not a witness. *Id.* at *4.

In her opinion denying Rocco's motion to disqualify, Judge Shwartz found that there existed ample alternative forms of evidence Rocco could use to establish that Marks "was in a position to have filed a notice of tort claim on behalf of Ms. Bailey," by April 14, 2008, and that such evidence could establish that Rocco did not proximately cause the failure to timely file a notice of claim. (Op. Tr. 24:2–6.) On appeal, Rocco contends that Judge Shwartz failed to recognize that Marks's testimony is vital because it will allow the jury to weigh his credibility. In light of the record evidence on which Judge Shwartz's decision was based, Rocco's argument is unpersuasive. Judge Shwartz pointed to a variety of evidence in the record supporting Rocco's defense, including (1) an email from Marks indicating that he knew Rocco was no longer Bailey's attorney as of December 2007 (before the police incident); (2) Rocco's testimony that her representation of Bailey was limited to marital matters; (3) Rocco's testimony about what she knew about the incident; (4) emails demonstrating that Marks represented Bailey as early as March 2008; and (5) Marks's testimony at the hearing on the motion to disqualify, which Rocco may employ at trial. (Op. Tr. 23–25.) Given this volume of evidence, the Court concludes that Judge Shwartz did not err in concluding that Marks is not a necessary witness, and her denial of Rocco's motion to disqualify Marks is affirmed.

As for Rocco's motion for leave to bring a third-party complaint against Marks, Judge Shwartz treated it as a motion to amend the final pretrial order pursuant to Fed.R.Civ.P. 16 because it was not memorialized therein and was first raised after the final pretrial order had been entered. A final pretrial order may be modified only to prevent manifest injustice. *Pharm. Sales & Consulting Corp. v. J.W.S. Delavau, Co.,* 59 F.Supp.2d 408, 411 (D.N.J.1999). Whether manifest injustice exists requires inquiry into eight factors: (1) the prejudice or surprise in fact to the non-moving party; (2) the ability of that party to cure the prejudice; (3) the extent to which waiver of the rule would disrupt the orderly and efficient trial of the case; (4) bad faith and willfulness on the part of the movant; (5) the ability of the movant to have discovered witnesses, evidence, claims or defenses earlier; (6) the validity of the excuse offered by the party; (7) the importance of the proffered evidence, claims or defenses; and (8) whether the request to amend is a matter of a new strategy or tactic. *Scopia Corp. v. Green Tree Mortg. Co.,* 184 F.R.D. 526, 528–29 (D.N.J.1998).

**\*16** Judge Shwartz determined that "there is surprise to the opposing party; there has been no mention of how to cure the surprise ...; amendment would disrupt the orderly and efficient trial of the case; Rocco could have acted on the evidence underlying the claims earlier; and the importance of the proffered claim

is minimal ." (Op. Tr. 30:24–31:6.) Rocco does not challenge the law Judge Shwartz applied, but does challenge her application of it. Her contentions, however, are unavailing.

First, while Rocco asserts that there was no surprise because Marks should have known he was potentially liable as a successor attorney, she does not demonstrate any error in Judge Shwartz's finding that Rocco was not given permission to file—and Marks did not expect—a motion for leave to implead him. Second, Rocco's contention, based on Marks's expressions of confidence in his case, that the surprise can be cured easily by having another attorney step in is devoid of support. Third, Rocco states that because no trial date has been set, a replacement attorney would have time to "get up to speed" (Appellant's Br. at 16), but this assertion ignores the volume of discovery in this case and the fact that discovery has been completed. Fourth, Rocco argues that she did not demonstrate bad faith and did not have an opportunity to discover the claim earlier because Bailey's "new" claim was not raised until August 2010, but she does not point to any error in Judge Shwartz's determination that the facts underlying the claim were available to her well before August 2010. Fifth, Rocco contends that Judge Shwartz made light of the impact of her claim. She argues that in addition to any proximate cause defense she might have, Marks may be liable for some portion of Bailey's damages under *LaBracio Family P'ship v. 1239 Roosevelt Ave., Inc.,* 340 N.J.Super. 155, 773 A.2d 1209 (App.Div.2001). Notwithstanding, she fails to account for her ability to bring an action for contribution or indemnification. Finally, she takes issue with Judge Shwartz's determination that the motion for leave to amend "smacks of being sought for tactical purposes," and she points to an example of her accommodation of Bailey's claims. Nevertheless, she does not adequately explain why, if she learned about the notice of claim issue in August 2010 and had knowledge of facts related to that issue well before then, she declined to seek leave to amend until more than two weeks after the entry of the pretrial order. The Court concludes that Judge Shwartz's decision to deny Rocco leave to amend was not clearly erroneous or contrary to law, and it is affirmed.

## VII. Conclusion

For the foregoing reasons, the summary judgment motion filed by the City of Englewood, Barrett, Gonzalez, and White is granted; Bailey's motion for summary judgment against the City of Englewood, Barrett, Gonzalez, and White is denied; Judge Shwartz's decision to deny Rocco's motions to disqualify counsel and for leave to amend is affirmed; the remainder of the summary judgment motions are denied without prejudice; and the case is remanded to New Jersey state court. *See Parker,* 620 F.3d at 276 n. 2. An appropriate order will be entered.

D.N.J.,2011.
Bailey v. Gibbons
Slip Copy, 2011 WL 4056202 (D.N.J.)

END OF DOCUMENT

95 *N.J.L.J.* 1145
November 9, 1972

**ADVISORY COMMITTEE ON PROFESSIONAL ETHICS**

**Appointed by the New Jersey Supreme Court**

**OPINION 243**

**Conflict of Interest
Representing Mortgagor and
Mortgagee Representing Vendor and Vendee**

An attorney asks this Committee what would constitute full disclosure of potential conflict of interest positions in which he might find himself if he represents, for example, the lender and borrower in a mortgage transaction or the purchaser and seller in a real estate transaction. The attorney has proposed forms of letters, of disclosure which might be written prior to embarking upon such representation, in an endeavor to apprise the prospective clients of the possible conflicts which might arise. Twelve possible conflict situations are suggested by the inquirer in a proposed form of letter. One might conceive of other possible situations. However, we believe that any such form letters would prove more confusing than helpful to an uninformed layman.

In considering the problem, the bar has for guidance the Supreme Court's opinion in *In re Kamp*, 40 *N.J.* 588 (1963), in which, the Court cited the Canon of Professional Ethics, Canon 6 then part of our court rules, and pointed out that an attorney who primarily represented a vendor of realty as, well as the purchaser, without disclosing such fact to the purchaser, violated the canon. The Court stated that the fact that there had existed in that transaction no situation which cast doubt upon the advisability of the purchaser accepting title did not exculpate the attorney. At page 596, the Court pointed out that, where the same attorney represents the purchaser of real estate and also the party financing the transaction (such as a bank or savings and loan association), to the extent that both parties seek a marketable title there is no conflict of interest, but that a conflict might
arise concerning the terms of financing and, therefore, it was, the duty of the attorney to make clear to the purchaser the potential area of conflict.

Canon 6 is now superseded by the Disciplinary Rules of the Code of Professional Responsibility adopted by our Supreme Court and now part of the Rules Governing

the Courts of the State of New Jersey. DR 5-105(C) provides that a lawyer may represent multiple clients if he believes that he can adequately represent the interests of each and if each consents to the representation after full disclosure of the facts and of the possible effect of such representation on the exercise of his independent professional judgment on behalf of each.

It seems clear that there is a greater potential danger in the representation by an attorney of a buyer and a seller in a real estate transaction than there is in his representing a lender and a borrower. In the latter transaction, as noted in *In re Kamp*, *supra*, each side seeks a clear and marketable title and, therefore, there can be no conflict on that score. The attorney representing the lending institution is concerned that there be no possible cloud on the title and, hence, he is equally protecting both parties.

With respect to the terms of the financing arrangement between the lending institution and the borrower - the inquirer concerns himself principally with this type of representation, although obviously the same situation might arise between a private lender and a borrower - the attorney rarely enters the picture until these are resolved and they generally are specifically set forth in a letter sent to the borrower by the lending institution. *In re Kamp*,
*supra*. The borrower is asked to sign a copy of the letter approving the terms and return it to the lending institution. The provisions of the mortgage and the note or bond will be in accordance with the commitment for the loan originally sent to the borrower.

It is true that at this stage of the proceedings, where the borrower is represented by the lender's counsel, the latter, in drawing the mortgage and note or bonds could depart from the terms of the commitment to the detriment of the borrower, but this is an unlikely situation. Mortgagors are now given protection by statute against such things as being improperly charged without their consent for obtaining a loan, improper prepayment provisions, changes in interest rate, etc. *N.J.S.A.* 46:10A and 46:lOB. These statutes contain penal provisions. *See*, also, Federal Reserve Regulation Z, where, under certain circumstances, copies of mortgages, notes and other incitements evidencing indebtedness are required to be given to the borrower.

---

While we believe that the better practice would be to have the borrower separately represented practical consideration must be given to the cost of one attorney for the borrower, rather than two, and the fact that in protecting the lender the attorney will also protect the borrower. The possible conflict of interest situation weighed in that frame of reference is so minimal as not to require us to find it unethical. An attorney for a lending institution may represent both the institution and the borrower, providing, of course, that he makes it plain to the borrower that he is representing the lender

also and that, if an unforeseen conflict does arise, he will advise the borrower so that the latter can then obtain his own attorney.

As DR 5-105(C) states, the attorney in each case first must decide that he can properly exercise his independent professional judgment on behalf of both sides of the transaction. DR 5-105(A), in referring to when a lawyer should decline employment, says that he must do so if his independent professional judgment "will be or is likely to be adversely affected." Paragraph (C) of that rule uses the language that the lawyer may represent multiple clients "if he believes that he can adequately represent the interests of each." Therefore, it is a judgment to be made by each attorney as the situation arises, and any attempt by this Committee to promulgate guidelines would be presumptuous and raise the inference that lawyers could not be trusted to make proper decisions under DR 5-105. Lawyers have been put on notice by the *Kamp* case and by decisions of this Committee that they cannot with impunity represent obviously conflicting positions.

It seems to us that this Committee should not suggest or approve any form of letter from attorney to client but that it should be left to each individual attorney to make clear to the client that he is representing both parties.

The inquirer also asks whether the situation would be different if the attorney for the lending institution were also one of its directors. We think not. While as a director he might pass
upon the loan and its terms, his responsibilities as an attorney are entirely different. *See* our Opinion 229, 95 *N.J.L.J.* 81 (1972).

We do conclude, however, that one attorney should not represent both parties in connection with the preparation and execution of a contract of sale. Generally, it is at this stage of negotiations for the sale of property that a buyer and a seller have their greatest difficulties. Their interests are in conflict if for no other reason than the buyer wishes to obtain the property as cheaply as possible and the seller wishes to get the highest price. At this juncture, also, there can and frequently do arise disputes concerning fixtures to be left in the premises, assumption
of mortgages, mortgage contingencies, and other matters in which there can be serious disagreements, in all of which the interests of the buyer and seller will be diametrically opposed.

There are many reported cases which illustrate these problems and we cite but two, *Winter v. Toldt*, 32 *N.J. Super.* 443 (App. Div.
l954), and *Clark v. Jelsma*, 40 *N.J. Super.* 58 (App. Div. 1955). While these are both suits by real estate brokers, they provide examples of disputes between parties as to the provisions of a contract of sale.

Further difficulties are presented if the same attorney tries to represent both parties

at the closing, where there may be disputes about the changed condition of the proper-ty between the date of the contract of sale and the closing, adjustments of taxes and assessments, and escrow funds. Other matters might be mentioned, but these suffice to point up the danger involved. In such situations, the attorney cannot exercise his inde-pendent professional judgment in behalf of one client without adversely affecting the other. DR 5-105(A).

   We, therefore, conclude that, assuming full disclosure and consent, the practice of one attorney representing both the borrower and the lender may present problems in some instances, but is not unethical and is not precluded by decisional law and should be approached with great caution. However, the representation of a buyer and a seller in connection with the preparation and execution of a contract of sale of real property is so fraught with obvious situations where a conflict may arise that one attorney shall not undertake to represent both parties in such a situation.

* * *

113 *N.J.L.J.* 384
April 5, 1984

**ADVISORY COMMITTEE ON PROFESSIONAL ETHICS**

**Appointed by the New Jersey Supreme Court**

**OPINION 527**

**Conflict of Interest**
**Dual Representation of Defendant,**
**Physician, and Defendant Hospital**

The inquirer, "an attorney in the State of New Jersey engaged in the practice of law representing plaintiffs in medical malpractice cases" presents the following question:

Whether the same law firm may represent both defendant physician and defendant hospital in a medical malpractice case without violating DR 5-105.

In presenting the inquiry he states:

In many cases with which I have been concerned the same law firm has represented both defendant physician and defendant hospital, and/or two or more physicians, during settlement negotiations and litigation. The ethical problem exists when one defendant has contribution rights against the other defendants, or has knowledge of malpractice that could lead to an early settlement, which is not disclosed during discovery on advice of counsel.

He submits further:

... that when an attorney represents both defendants who may have contribution rights against each other, a conflict of interest exists much like the situation where the same firm represents both the driver and passenger in an automobile accident. Furthermore, the attorney may become privy to information which verifies the rights of one defendant against the other, or information which, while exculpating one defendant completely, inculpates the other. In the former situation there is a clear conflict; in the latter, an apparent conflict because the attorney may not advise the client to disclose such information without violating DR 4-101 with regard to the actual tortfeasor.

He, therefore, submits that the foregoing would constitute unethical conduct in violation of DR 5-105.

DR 5-105 is captioned as follows:

Refusing to Accept or Continue Employment if the Interests of Another Client May Impair the Independent Professional Judgment of the Lawyer.

The Disciplinary Rule contains four subdivisions, Paragraphs (A) through (D). We are primarily concerned with Paragraphs (A) and (B), and the extent to which (C) is an exception thereto.

Paragraph (A) is a prohibition against accepting employment "if the exercise of an attorney's independent professional judgment in behalf of a client will be or is likely to be adversely affected by the acceptance of the proffered employment, except to the extent permitted under DR 5-105 (C)."

Paragraph (B) provides that a lawyer shall not continue multiple employment under the same conditions; namely, if the attorney's independent professional judgment in behalf of a client will be or is likely to be adversely affected by his representation of another client except to the extent permitted under DR 5-105 (C).

We, therefore, look to Paragraph (C) to determine whether the facts and circumstances in this case, as submitted, come within the exceptions to the general rule.

DR 5-105 (C) provides as follows:

In situations covered by DR 5-105 (A) and (B) except as prohibited by rule, opinion, directive or statute, a lawyer may represent multiple clients if he believes that he can adequately represent the interests of each and if each consents to the representation after full disclosure of the facts and of the possible effect of such representation on the exercise of his independent professional judgment on behalf of each.

The said subsection is clear and unambiguous and defines the standard of conduct and the duties and obligations of an attorney in representing multiple clients. Therefore, an attorney who represents a defendant physician or physicians and a defendant hospital and who sincerely believes that he can adequately represent the interests of each, each of his clients consents to the representation after a full disclosure of the facts and of the possible effect of such representation in the exercise of his independent professional judgment on behalf of each, may represent such multiple clients.

The consent must be an informed consent and must be nothing less than "knowing, intelligent and voluntary. Consents must be obtained in such a way as to insure that the client has adequate time...to reflect upon the choice..." *See In re Dolan*, 76 *N.J.* 1,

13 (1978).

The factual situation described by the inquirer undoubtedly involves the representation of a hospital and a physician or physicians by an attorney who has been retained by one or more insurance companies and, therefore, all parties in interest would be litigants and their representatives who are well informed and sophisticated. The weight to be given to the consents of such litigants is considerably greater than that usually involved in the consents referred to in other cases, such as *Dolan*. See footnote 1 [1]

It is not for this Committee to decide when an attorney should make the decision that he can "adequately represent the interests of each," but attorneys should be cautioned that great care should be taken in making this decision so as not to cause unnecessary delay when it later becomes clear that such multiple representation cannot continue.

* * *

---

*Footnote: 1* [1]

*The Supreme Court directive set forth in 91 N.J.L.J. 81 (Feb. 8, 1968) specifically prohibits representation of conflicting interests even with informed consent in automobile cases. Subsequently, that directive as modified by Supreme Court directive October 8,1970 (93 N.J.L.J. 712) in cases involving husband and wife or parent and child.*